# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| RICHARD HOCKSTEIN, Derivatively on Behalf of GENERAL MOTORS COMPANY, | ) ) ) Civil Action No.: ) |
| Plaintiff, | ) ) VERIFIED SHAREHOLDER |
| v. | ) DERIVATIVE COMPLAINT FOR ) BREACH OF FIDUCIARY DUTY, |
| MARY T. BARRA, THEODORE M. SOLSO, STEPHEN J. GIRSKY, PATRICIA F. RUSSO, THOMAS M. SCHOEWE, ERROLL B. DAVIS, JR., KATHRYN V. MARINELLO, ROBERT D. KREBS, CYNTHIA A. TELLES, JAMES J. MULVA, MICHAEL G. MULLEN, DAVID BONDERMAN, E. NEVILLE ISDELL, CAROL M. STEPHENSON, DANIEL F. AKERSON, EDWARD E. WHITACRE, JR., and PHILIP A. LASKAWY, | ) WASTE OF CORPORATE ASSETS, ) AND UNJUST ENRICHMENT ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| -and- | ) ) |
| GENERAL MOTORS COMPANY, a Delaware corporation, | ) ) ) |
| Nominal Defendant. | ) ) __DEMAND FOR JURY TRIAL__ |

## NATURE OF THE ACTION

1.     This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant General Motors Company ("GM" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in billions of dollars in damages to GM's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to billions of dollars in potential liability for violations of state and federal law.

2.     GM designs, builds, and sells cars, trucks, and automobile parts worldwide.  For years, the Company has touted the purported safety of its vehicles. Indeed, the Company's website has long touted that "[q]uality and safety are at the top of the agenda at GM," and that "GM proactively design[s] and test[s] features that help keep [its customers] safe and enjoy the drive."

3.     GM's safety first image was shattered in February 2014, when the Company belatedly recalled millions of vehicles with a deadly flaw in the ignition switch.  As reported by GM, the recalled cars' ignition switches can easily be knocked out of the "run" position into the "off" or "accessory" position if the key is jostled by a driver's knee, if the key is attached to a heavy key-ring, or if the car simply hits a bumpy patch of road.  The loss of power significantly increases the likelihood of an accident through the commensurate loss in power steering and

brake functionality.  To make matters worse, the loss in power also rendered the airbags non-operational.  Thus, after losing control of the vehicle due to the loss of power, passengers would not be protected by the cars' airbags upon impact, and were therefore significantly more prone to severe injuries and fatalities.

4.     GM confirmed that at least thirteen deaths have been linked to the faulty design.  Federal crash data shows that the death toll may be much greater, with over three hundred deaths linked to airbags that failed to deploy on two of the models that were recalled by the Company.  Shockingly, according to a chronology that GM provided to safety regulators, the Company was made aware of problems with the ignition systems and airbag non-deployments numerous times between 2001 and the February 2014 recall, but the Individual Defendants (as defined herein) utterly failed to properly address the deadly defect for years.  Worse, the recalled part is only expected to cost between $2 and $5 per vehicle, and the repair process can be completed in a matter of minutes.  The fact that GM took so long to address the deadly problem is inexcusable.  Indeed, as the Company's Chief Executive Officer ("CEO") recently admitted, "[s]omething went very wrong in our processes in this instance, and terrible things happened."

5.     As a direct result of this unlawful course of conduct, the Company is now the subject of numerous lawsuits, including various personal injury suits and

class action suits relating to the defect, as well as at least one federal securities class action lawsuit filed on behalf of investors who purchased GM's shares.

## JURISDICTION AND VENUE

6.     Jurisdiction is conferred by 28 U.S.C. §1332.   Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) GM maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to GM, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

9.     Plaintiff Richard Hockstein was a shareholder of GM at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current GM shareholder.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant**

10.     Nominal Defendant GM is a Delaware corporation with principal executive offices located at 300 Renaissance Center, Detroit, Michigan. Accordingly, GM is a citizen of Delaware and Michigan.  GM designs, builds, and sells cars, trucks, and automobile parts worldwide.  GM also provides automotive financing services through the General Motors Financial Company, Inc.  GM was incorporated in Delaware in 2009 after acquiring substantially all of the assets and assuming certain liabilities of General Motors Corporation ("Old GM"), its predecessor company, from a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code ("363 Sale").  Upon completion of the 363 Sale, Old GM was renamed Motors Liquidation Company, which was dissolved on December 15, 2011.

**Defendants**

11.     Defendant Mary T. Barra ("Barra") is GM's CEO and a director and has been since January 2014.  Defendant Barra was also GM's Executive Vice

President, Global Product Development, Purchasing & Supply Chain from August 2013 to January 2014; Senior Vice President, Global Product Development from February 2011 to August 2013; Vice President, Global Human Resources from July 2009 to February 2011; Vice President, Global Manufacturing Engineering from February 2008 to July 2009; and Executive Director, Vehicle Manufacturing from January 2005 to February 2008. Defendant Barra knowingly, recklessly, or with gross negligence: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Barra the following compensation as an executive:

| Year | Salary | Stock Awards | Change in Pension Value and NQ Deferred Compensation | All Other Compensation | Total |
|------|--------|--------------|-----------------------------------------------------|------------------------|-------|
| 2012 | $750,000 | $3,906,484 | $250,771 | $28,445 | $4,935,700 |

Defendant Barra is a citizen of Michigan.

12.     Defendant Theodore M. Solso ("Solso") is GM's Chairman of the Board of Directors (the "Board") and has been since January 2014 and a director and has been since June 2012. Defendant Solso is also a member of GM's Audit

Committee and has been since at least April 2013. Defendant Solso knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Solso the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|---|---|---|---|
| 2012 | $128,333 | $6,965 | $135,298 |

Defendant Solso is a citizen of Indiana.

13.    Defendant Stephen J. Girsky ("Girsky") is a GM director and has been since July 2009. Defendant Girsky was also GM's Vice Chairman of Corporate Strategy, Business Development, Global Product Planning, and Global Purchasing and Supply Chain from February 2011 to January 2014; Vice Chairman of Corporate Strategy and Business Development from March 2010 to February 2010; and Interim President of GM Europe from July 2012 to February 2013. Defendant Girsky is a senior advisor of GM and will be in that position until April 2014. Defendant Girsky is also a member of GM's Public Policy Committee and has been since at least August 2010. Defendant Girsky knowingly, recklessly, or

with gross negligence: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  GM paid defendant Girsky the following compensation as an executive:

| Year | Salary | Stock Awards | Change in Pension Value and NQ Deferred Compensation | All Other Compensation | Total |
|------|--------|--------------|------------------------------------------------------|------------------------|-------|
| 2012 | $600,000 | $4,811,291 | $1,052 | $34,578 | $5,446,921 |
| 2011 | $600,000 | $4,682,223 | $408 | $24,583 | $5,307,214 |
| 2010 | $416,667 | $3,225,000 | $6,782 | $63,609 | $3,712,058 |

Defendant Girsky is a citizen of New York.

14.    Defendant Patricia F. Russo ("Russo") is a GM director and has been since July 2009.  Defendant Russo was also GM's Lead Director form March 2010 to January 2014.  Defendant Russo knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and

commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Russo the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|------|------|------|
| 2012 | $240,000 | $11,957 | $251,957 |
| 2011 | $240,000 | $8,876 | $248,876 |
| 2010 | $218,333 | $8,145 | $226,478 |

Defendant Russo is a citizen of Florida.

15.    Defendant Thomas M. Schoewe ("Schoewe") is a GM director and has been since November 2011. Defendant Schoewe is also Chairman of GM's Audit Committee and has been since February 2013. Defendant Schoewe knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Schoewe the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|------|------|------|
| 2012 | $211,667 | $11,957 | $223,624 |
| 2011 | $33,333 | $740 | $34,073 |

Defendant Schoewe is a citizen of Florida.

16.     Defendant Erroll B. Davis, Jr. ("Davis") is a GM director and has been since July 2009.  Defendant Davis was also a director of Old GM from 2007 to 2009.  Defendant Davis is a member of GM's Audit Committee and has been since at least August 2010 and Chairman of the Public Policy Committee and has been since at least April 2011.  Defendant Davis knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  GM paid defendant Davis the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|------|------|------|
| 2012 | $230,000 | $13,074 | $243,074 |
| 2011 | $230,000 | $10,101 | $240,101 |
| 2010 | $220,000 | $9,312 | $229,312 |

Defendant Davis is a citizen of Georgia.

17.     Defendant Kathryn V. Marinello ("Marinello") is a GM director and has been since July 2009.  Defendant Marinello was also a director of Old GM from 2007 to 2009.  Defendant Marinello is a member of GM's Audit Committee and Public Policy Committee has been since at least August 2010.  Defendant

Marinello knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Marinello the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|------|------|------|
| 2012 | $220,000 | $11,957 | $231,957 |
| 2011 | $220,000 | $8,876 | $228,876 |
| 2010 | $206,667 | $8,145 | $214,812 |

Defendant Marinello is a citizen of Minnesota.

18. Defendant Robert D. Krebs ("Krebs") is a GM director and has been since July 2009. Defendant Krebs is also a member of GM's Audit Committee and has been since at least August 2010. Defendant Krebs will be retiring from the Board at the Company's 2014 Annual Meeting of Stockholders ("2014 Annual Meeting"). Defendant Krebs knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety,

as well as with respect to GM's business and financial condition.   GM paid

defendant Krebs the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|------|------|------|
| 2012 | $230,000 | $11,957 | $241,957 |
| 2011 | $230,000 | $8,876 | $238,876 |
| 2010 | $208,333 | $8,145 | $216,478 |

Defendant Krebs is a citizen of Illinois.

19.     Defendant Cynthia A. Telles ("Telles") is a GM director and has been

since April 2010.   Defendant Telles is also a member of GM's Public Policy

Committee and has been since at least August 2010.   Defendant Telles does not

intend to stand for reelection at the 2014 Annual Meeting.   Defendant Telles

knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii)

failed to timely inform GM's customers about safety defects; (iii) failed to

implement adequate internal controls and procedures to insure timely reporting of

safety defects; and (iv) disseminated inaccurate information with regard to the

Company's safety record and commitment to safety, as well as with respect to

GM's business and financial condition.   GM paid defendant Telles the following

compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|------|------|------|
| 2012 | $200,000 | $11,957 | $211,957 |
| 2011 | $200,000 | $8,876 | $208,876 |
| 2010 | $150,000 | $4,761 | $154,761 |

Defendant Telles is a citizen of California.

20.     Defendant James J. Mulva ("Mulva") is a GM director and has been since June 2012.   Defendant Mulva is also a member of GM's Public Policy Committee and has been since at least April 2013.   Defendant Mulva knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.   GM paid defendant Mulva the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2012 | $116,667 | $60 | $116,727 |

Defendant Mulva is a citizen of Texas.

21.     Defendant Michael G. Mullen ("Mullen") is a GM director and has been since February 2013.   Defendant Mullen is also a member of GM's Audit Committee and Public Policy Committee and has been since at least March 2014. Defendant Mullen knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely

reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. Defendant Mullen is a citizen of Maryland.

22.     Defendant David Bonderman ("Bonderman") is a GM director and has been since July 2009. Defendant Bonderman was also a member of GM's Public Policy Committee in at least August 2010. Defendant Bonderman does not intend to stand for reelection at the 2014 Annual Meeting. Defendant Bonderman knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Bonderman is the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2012 | $200,000 | $11,957 | $211,957 |
| 2011 | $200,000 | $8,876 | $208,876 |
| 2010 | $83,333 | $8,145 | $91,478 |

Defendant Bonderman is a citizen of Texas.

23.     Defendant E. Neville Isdell ("Isdell") is a GM director and has been since July 2009. Defendant Isdell was also a director of Old GM from 2008 to 2009. Defendant Isdell was a member of GM's Public Policy Committee from at least August 2010 to at least April 2013 and was Chairman of that Committee in at least August 2010. Defendant Isdell knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Isdell the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|------|------|------|
| 2012 | $210,000 | $11,957 | $221,957 |
| 2011 | $210,000 | $8,876 | $218,876 |
| 2010 | $210,000 | $8,145 | $218,145 |

Defendant Isdell is a citizen of Georgia.

24.     Defendant Carol M. Stephenson ("Stephenson") is a GM director and has been since July 2009. Defendant Stephenson knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated

inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.   GM paid defendant Stephenson the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|------|------|------|
| 2012 | $200,000 | $11,957 | $211,957 |
| 2011 | $200,000 | $8,876 | $208,876 |
| 2010 | $200,000 | $8,145 | $208,145 |

Defendant Stephenson is a citizen of Canada.

25.   Defendant Daniel F. Akerson ("Akerson") was GM's CEO from September 2010 to January 2014; Chairman of the Board from January 2011 to January 2014; and a director from July 2009 to January 2014.   Defendant Akerson was also a member of GM's Audit Committee from at least August 2010 to September 2010.   Defendant Akerson knowingly, recklessly, or with gross negligence: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.   GM paid defendant Akerson the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2012 | $1,700,000 | $9,332,659 | $70,149 | $11,102,808 |
| 2011 | $1,700,000 | $5,947,229 | $55,514 | $7,702,743 |
| 2010 | $566,667 | $1,766,664 | $194,088 | $2,527,419 |

Defendant Akerson is a citizen of Virginia.

26.     Defendant Edward E. Whitacre, Jr. ("Whitacre") was GM's CEO from December 2009 to September 2010 and Chairman of the Board from July 2009 to December 2010.    Defendant Whitacre knowingly, recklessly, or with gross negligence: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.    GM paid defendant Whitacre the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $1,133,333 | $3,533,330 | $336,417 | $5,003,080 |

Defendant Whitacre is a citizen of Texas.

27.     Defendant Philip A. Laskawy ("Laskawy") was a GM director from July 2009 to June 2013 and a director of Old GM from 2003 to 2009.  Defendant Laskawy was also Chairman of GM's Audit Committee from at least August 2010

to at least April 2012. Defendant Laskawy knowingly or recklessly: (i) failed to timely report safety defects to regulators; (ii) failed to timely inform GM's customers about safety defects; (iii) failed to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Laskawy the following compensation as a director:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2012 | $230,000 | $12,912 | $242,912 |
| 2011 | $230,000 | $8,876 | $238,876 |
| 2010 | $230,000 | $8,145 | $238,145 |

Defendant Laskawy is a citizen of Connecticut.

28.  The defendants identified in ¶¶11, 13, 25-26 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶11-27 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13, 16-17, 19-23 are referred to herein as the "Public Policy Committee Defendants." Collectively, the defendants identified in ¶¶11-27 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

29.   By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe GM and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GM in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of GM and not in furtherance of their personal interest or benefit.

30.   To discharge their duties, the officers and directors of GM were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of GM were required to, among other things:

(a)   ensure the Company complied with its legal obligations and requirements, including by notifying vehicle owners and providing a remedy for any vehicle defect that creates an unreasonable risk to motor vehicle safety or a noncompliance with a safety standard and reporting safety defects to the National Highway Traffic Safety Administration ("NHTSA") within five days of discovering them;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how GM conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(d)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; and

(e)     properly and accurately guide investors and analysts as to the true condition of the Company at any given time, including making accurate statements about the Company's compliance with applicable laws.

**Breaches of Duties**

31.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of GM, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

32.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to: (i) fail to timely and adequately report safety defects to regulators; (ii) fail to timely and adequately inform its customers about safety defects; (iii) operate with inadequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminate inaccurate information with regard to the Company's commitment to safety, as well as with respect to GM's business and financial condition.  These improper practices wasted the Company's assets and caused GM to incur substantial damage.

33.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of GM, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, GM has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Public Policy Committee Defendants**

34.    In addition to these duties, under its Charter in effect since at least 2003, the Public Policy Committee Defendants, defendants Bonderman, Davis, Girsky, Isdell, Marinello, Mullen, Mulva, and Telles, owed specific additional

duties to GM.   The Public Policy Committee was required to review the Company's automotive safety, provide oversight and guidance to management, and discuss and bring to the attention of the Board and management issues that may affect the business operations, profitability, or public image or reputation of the Company.   The Public Policy Committee thus insured that the Board was well informed of matters involving the safety of GM vehicles.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.   In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36.   During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of GM, regarding the Individual Defendants' management of GM's operations and the safety of the Company's vehicles; and (ii) enhance the Individual Defendants' executive and directorial positions at GM and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this

plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

37.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper statements.

38.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

39.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein,

each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

41.    The National Traffic and Motor Vehicle Safety Act of 1966 requires that manufacturers notify owners of vehicles and provide a remedy for any vehicle defect that creates an unreasonable risk to motor vehicle safety or a noncompliance with a safety standard.  Automakers are also required to report safety defects to the NHTSA within five days of discovering them.  GM's officers and directors utterly failed to fulfill these legal obligations.

42.    GM recently submitted a chronology to the NHTSA detailing the Company's discovery and investigations of the ignition switch and airbag problems.  As described below, the chronology demonstrates that from at least 2001 through 2014, the Company steadily received multiple reports of serious defects with the ignition switches on many of the recalled vehicles that can cause the vehicles to lose power while driving.  In particular, the cars' ignition switch can easily be knocked out of the "run" position into the "off" or "accessory" position if the key is jostled by a driver's knee, if the keys are overly weighted by other keys attached to the keying, or if the car simply hits a bumpy patch of road.  The loss of power can result in a loss of power breaking and power steering, and further

renders the airbags non-operational. This ignition system flaw caused passengers in GM vehicles to be significantly more susceptible to severe injuries and fatalities.

43. Given the paramount importance of vehicle safety, GM's officers and directors presumably received regular reports concerning these defects, as well as reports concerning accidents in GM vehicles resulting in fatalities or serious injuries. Indeed, the Public Policy Committee regularly reviewed the Company's automotive safety record and regularly discussed such issues with the Board and management. Despite the numerous red flags detailed below, however, the Company's officers and directors utterly failed to address the issue for more than a decade.

**Red Flags at Old GM**

44. Between 2001 and 2009, GM's predecessor company, Old GM, was awash with red flags concerning the faulty ignition switches and failing airbags of the Company's vehicles. One report initiated in 2001, during pre-production development of the Saturn Ion, addressed an issue relating to the ignition switch's "passlock" system. The report stated that the causes of the problem included "low detent plunger force" in the ignition switch, but stated that an ignition switch design change had resolved the problem. Although the problem was purportedly resolved, a 2003 report documented an instance in which a service technician observed a stall while driving, noted that "[t]he owner had several keys on the key

ring," and stated that "[t]he additional weight of the keys had worn out the ignition switch." In that instance, the technician replaced the ignition switch and the report was closed. Various other reports collected at the time, along with the warranty and technical assistance data collected in support of these reports, included complaints of stalling. The Company, however, did not investigate the issue further at that time.

45. In 2004, around the time of the launch of the 2005 Chevrolet Cobalt, the Company learned of at least one incident in which a Chevrolet Cobalt lost engine power because the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. The Company's employees were able to replicate this phenomenon during test drives and an engineering inquiry, known within the Company as a Problem Resolution Tracking System inquiry ("PRTS"), was opened to investigate the issue. Engineers believed that low key cylinder torque effort was an issue and considered a number of potential solutions. Nonetheless, the PRTS was ultimately closed with no action.

46. In 2005, employees received new field reports of Chevrolet Cobalts losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column. Additional PRTSs were opened to assess this issue. During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a

"slotted" to a "hole" configuration to address the problem. That proposal was initially approved, but later canceled.

47.     On July 29, 2005, Amber Marie Rose, age 16, died in a crash when the airbag in a 2005 Chevrolet Cobalt failed to deploy. Ms. Rose's death was the first that has been officially linked to the faulty ignition switch. The Company's Legal Staff opened a file relating to this crash in September 2005.

48.     Rather than redesign the key head and recall the vehicles that were known to suffer from this dangerous flaw, the Company instead merely issued a service bulletin in December 2005, which applied to a number of vehicles that were equipped with the same ignition switch, including vehicles subject to the recall. The service bulletin specifically applied to: 2005-2006 Chevrolet Cobalt, 2003-2006 Saturn Ion, 2006 Chevrolet HHR, and 2006 Pontiac Solstice. The service bulletin attempted to shift the responsibility of preventing catastrophic and potentially fatal ignition failure to the Company's dealers and customers. In particular, the service bulletin informed dealers that "there is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort"; "[t]he concern is more likely to occur if the driver is short and has a large and/or heavy key chain"; and "the customer should be advised of this potential and should take steps to prevent it – such as removing unessential items from their key chain." The service bulletin also advised dealers that "Engineering

has come up with an insert for the key ring" that would help prevent the issue, but did not mandate or otherwise require installation of the insert. Indeed GM's warranty records indicate that the inserts were only provided to 474 customers who brought their vehicles into dealers for service.

49. On April 26, 2006, the GM design engineer responsible for the Chevrolet Cobalt's ignition switch signed a document approving changes to the ignition switch to prevent further failures, including the use of new parts that increased torque force in the switch. The changes were implemented at some point during the 2007 model year, but the Company did not issue a recall for the vehicles using the older, faulty ignition system.

50. On March 29, 2007, a group of the Company's employees met with NHTSA representatives and were specifically informed of Ms. Rose's fatal crash. The employees were further informed that the crash involved a 2005 Chevrolet Cobalt, a frontal impact, the airbags did not deploy, and that the car's power mode status was in "accessory" position at the time of the crash. Following the meeting, a GM investigating engineer was directed to track crashes in which Chevrolet Cobalts were involved in frontal impacts and the airbags did not deploy. By the end of 2007, the Company received notice of ten such incidents, with data for four of the crashes showing that the ignition was in the "accessory" position. The Company did not issue a recall for the faulty ignition switches at that time.

51.    In February 2009, another PRTS was opened and resulted in the top of the key being changed from a "slot" design to a "hole" design, as initially proposed in 2005.   According to the PRTS, "[c]ustomers with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental ignition shut-off.   Changing from a slot to a hole will significantly reduce downward force and the likelihood of this occurrence."   The key design change was implemented in 2010 Chevrolet Cobalts, but the Company did not issue a recall for the multiple models of cars using the older, faulty ignition switches at that time.

**Following Old GM's Bankruptcy, Red Flags Continued to Pile Up at GM While the Individual Defendants Issued Misleading Statements to Conceal the Deadly Defect**

52.    A majority of the current Board was appointed in or about July 2009 when GM was incorporated, after acquiring substantially all of the assets and assuming certain liabilities of Old GM.   Shortly after GM was incorporated, the Pubic Policy Committee was created.   The Public Policy Committee was required to review the Company's automotive safety, provide oversight and guidance to management, and discuss and bring to the attention of the Board and management issues that may affect the business operations, profitability, or public image or reputation of the Company.   Through the Public Policy Committee, which included various members of the Board, the newly formed Board and management were

presumably updated on serious defects that had been previously discovered to affect the safety of the Company's cars, including with respect to the ignition switches and failed air bag deployments detailed herein. Further, shortly after the new Board took the reins, red flags continued to multiply.

53.   In March 2010, Brooke Melton was killed in a crash in her 2005 Chevrolet Cobalt. As with many of the previously reported accidents, the ignition switch in Ms. Melton's car had moved from "run" to "accessory" at the time of her crash, thus causing the engine to shut off while she was driving.   Documents uncovered in the lawsuit filed by her family further revealed that GM issued a technical service bulletin for the 2005 Chevrolet Cobalt dated February 28, 2005, for engine stalling as a result of the key moving in the ignition.[1]  Given that vehicle safety is paramount to the Company's business, it is reasonable to presume that the Board was informed of the details of Ms. Melton's death, as well as the subsequent investigation and lawsuit by her family.   Nonetheless, with the acquiescence of the Board, the Company failed to issue a recall relating to the well-known faulty ignition switch, and failed to otherwise inform its customers of the deadly defect.

_____

[1] For reasons not disclosed by the Company, the issuance of the February 2005 service bulletin was not mentioned in GM's chronology of its recall of the 2005-2007 Chevrolet Cobalts, and the Company has inexplicably failed to count Ms. Melton's death among the thirteen people that GM admits were killed as a result of ignition problems.

54.     The following month, on April 7, 2010, the Company filed its Annual Report on Form 10-K for the period ended December 31, 2009, with the U.S. Securities and Exchange Commission ("SEC").  The Form 10-K improperly touted that the Company was poised to compete in the global automotive marketplace due to the purported safety and reliability of GM's vehicles.  The Form 10-K further incorrectly assured the public that potential defects would be timely reported and the vehicles in question would be recalled if necessary.  The Form 10-K stated, in relevant part:

**Competitive Position**

The global automotive industry is highly competitive. The principal factors that determine consumer vehicle preferences in the markets in which we operate include price, quality, available options, style, safety, reliability, fuel economy and functionality. Market leadership in individual countries in which we compete varies widely.

* * *

*Safety*

New vehicles and equipment sold in the U.S. are required to meet certain safety standards promulgated by the NHTSA. The National Traffic and Motor Vehicle Safety Act of 1966 authorized the NHTSA to determine these standards and the schedule for implementing them. In addition, ***in the case of a vehicle defect that creates an unreasonable risk to motor vehicle safety or does not comply with a safety standard, the National Traffic and Motor Vehicle Safety Act of 1966 generally requires that the manufacturer notify owners and provide a remedy.***  The Transportation Recall Enhancement, Accountability and Documentation Act requires us to report certain information relating to certain customer complaints, warranty claims, field reports and lawsuits in the U.S. and fatalities and recalls outside the U.S.

We are subject to certain safety standards and recall regulations in the markets outside the U.S. in which we operate. These standards often have the same purpose as the U.S. standards, but may differ in their requirements and test procedures. From time to time, other countries pass regulations which are more stringent than U.S. standards. Most countries require type approval while the U.S. and Canada require self-certification.

The Form 10-K was signed by defendants Whitacre, Akerson, Bonderman, Davis, Girsky, Isdell, Krebs, Laskawy, Marinello, Russo, and Stephenson.

55.   On May 17, 2010, August 16, 2010, and November 10, 2010, the Company filed its Quarterly Reports on Forms 10-Q with the SEC informing investors that a critical component of the reliability of their financial statements was the Company's "ability to maintain quality control over [its] vehicles and avoid material vehicle recalls."   The Forms 10-Q each failed to disclose that the Company had discovered a serious safety defect with ignition switches that affected millions of GM vehicles.

56.   On March 1, 2011, the Company filed its Annual Report on Form 10-K for the period ended December 31, 2010, with the SEC.   Using substantial similar language to the April 7, 2010 Form 10-K, the March 1, 2011 Form 10-K again improperly touted that the Company was poised to compete in the global automotive marketplace due to the purported safety and reliability of GM's vehicles, and incorrectly assured the public that potential defects would be reported and the vehicles in question would be recalled if necessary.   The March 1, 2011

Form 10-K was signed by defendants Akerson, Bonderman, Davis, Girsky, Isdell, Krebs, Laskawy, Marinello, Russo, Stephenson, and Telles.

57.    On May 6, 2011, the Company filed its Quarterly Report on Form 10-Q with the SEC again informing investors that a critical component of the reliability of their financial statements was the Company's "ability to maintain quality control over [its] vehicles and avoid material vehicle recalls."  The Form 10-Q again failed to disclose that the Company had discovered a serious safety defect with ignition switches for many of its vehicles.

58.    In late July 2011, a meeting was held at GM involving Legal Staff, Field Performance Assessment ("FPA"), and Product Investigations personnel who would be involved in the Field Performance Evaluation ("FPE") process.  Soon thereafter, in August 2011, a Field Performance Assessment Engineer ("FPAE") was assigned to move forward with an FPE investigation of a group of crashes in which airbags in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 had not deployed during frontal impacts.

59.    GM's initial investigation of these crashes revealed that many of the ignitions for the vehicles involved in the crashes were recorded as having been in the "accessory" or "off" positions at the time of the crash.  Yet again, at the direction of the Individual Defendants, the Company failed to issue a recall or

otherwise inform its customers of the dangers associated with the faulty ignition switches.

60. On August 5, 2011 and November 9, 2011, the Company filed its Quarterly Reports on Forms 10-Q with the SEC reiterating that a critical component of the reliability of their financial statements was the Company's "ability to maintain quality control over [its] vehicles and avoid material vehicle recalls." The Forms 10-Q again failed to disclose that the Company had confirmed a serious safety defect with ignition switches that appeared to be linked to non-deployment of airbags in vehicle crashes.

61. On February 27, 2012, the Company filed its Annual Report on Form 10-K for the period ended December 31, 2011, with the SEC. Using substantial similar language to the two previous Forms 10-K, the February 27, 2012 Form 10-K again improperly touted that the Company was poised to compete in the global automotive marketplace due to the purported safety and reliability of GM's vehicles, and incorrectly assured the public that potential defects would be reported and the vehicles in question would be recalled if necessary. The February 27, 2012 Form 10-K was signed by defendants Akerson, Bonderman, Davis, Girsky, Isdell, Krebs, Laskawy, Marinello, Russo, Schoewe, Stephenson, and Telles.

62. In May 2012, the FPAE, who was assigned to study the 2005-2007 model crashes with failed airbag deployments, studied a cross-section of steering

columns and ignition switches from Chevrolet Cobalts, Chevrolet HHRs, Pontiac G5s, and Saturn Ions. The investigation revealed that certain of these ignition switches exhibited torque performance below that specified by GM for the ignition switch. The investigation further revealed that the most prevalent shortfalls in performance were observed on ignition switches found in 2007 and earlier model year vehicles. While the investigation again confirmed defects with the ignition switches on these vehicles, the Company again failed to inform its customers or issue a recall.

63. On May 3, 2012, August 3, 2012, and October 31, 2012, the Company filed its Quarterly Reports on Forms 10-Q with the SEC noting that a critical component of the reliability of their financial statements was the Company's "ability to maintain quality control over [its] vehicles and avoid material vehicle recalls." The Forms 10-Q again failed to disclose that the Company had discovered a serious safety defect with ignition switches.

64. On February 15, 2013, the Company filed its Annual Report on Form 10-K for the period ended December 31, 2012, with the SEC. Using substantial similar language to the Forms 10-K noted above, the February 15, 2013 Form 10-K again improperly touted that the Company was poised to compete in the global automotive marketplace due to the purported safety and reliability of GM's vehicles, and incorrectly assured the public that potential defects would be reported

and the vehicles in question would be recalled if necessary. The February 15, 2013

Form 10-K was signed by defendants Akerson, Bonderman, Davis, Girsky, Isdell,

Krebs, Laskawy, Marinello, Mulva, Russo, Schoewe, Solso, Stephenson, and

Telles.

65.    In late April 2013, the FPAE learned that the torque performance of

GM ignition switches purchased after 2010 differed substantially from that of

ignitions switches that were originally installed on 2005 Chevrolet Cobalts.

Shortly thereafter, GM retained outside engineering resources to conduct a

comprehensive ignition switch survey and assessment. The Company, however,

did not inform its customers that a defective ignition switch had been again

confirmed, that the Company knew which years' vehicles were affected, or that the

root cause of the defect was being investigated by an outside engineering group.

66.    On May 2, 2013, July 25, 2013, and October 30, 2013, the Company

filed its Quarterly Reports on Forms 10-Q with the SEC reiterating that a critical

component of the reliability of their financial statements was the Company's

"ability to maintain quality control over [its] vehicles and avoid material vehicle

recalls." The Forms 10-Q did not disclose the serious safety defects that the

Company had identified in GM ignition switches.

67.    On October 29, 2013, GM was provided with supplier records from

one of the Company's suppliers showing that changes affecting the torque on the

ignition switches had, in fact, been made to the part in 2006. The implemented changes increased the switch's torque performance. The issue was presented to the Field Performance Evaluation Review Committee ("FPERC") and the Executive Field Action Decision Committee ("EFADC"). These two committees reviewed the findings in early December, culminating in an EFADC meeting on December 17, 2013. Although it was clear at the time that the ignition switch torque was inadequate for older models, rather than issue an immediate recall and/or provide notification to its customers, the Company opted to seek further analysis.

68.     On January 31, 2014, the EFADC internally directed a safety recall of approximately 778,000 vehicles, including the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007. The recall was not immediately communicated to the NHTSA or the Company's customers.

69.     On February 6, 2014, the Company filed its Annual Report on Form 10-K for the period ended December 31, 2013, with the SEC. Using substantial similar language to the Forms 10-K noted above, the February 6, 2014 Form 10-K brazenly and improperly continued to tout that the Company was poised to compete in the global automotive marketplace due to the purported safety and reliability of GM's vehicles. The Form 10-K also incorrectly assured the public that potential defects would be timely reported and the vehicles in question would be recalled if necessary. The Form 10-K did not disclose that a week earlier, the

EFADC specifically directed a safety recall for more than three quarters of a million vehicles.  The February 6, 2014 Form 10-K was signed by defendants Barra, Solso, Bonderman, Davis, Girsky, Isdell, Krebs, Marinello, Mullen, Mulva, Russo, Schoewe, Stephenson, and Telles.

### THE TRUTH SLOWLY EMERGES

70.    On February 7, 2014, the Company notified the NHTSA of its decision to recall the 2005-2007 Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The recall was not announced to the public until a week later on February 13, 2014.

71.    On February 24, 2014, GM expanded the safety recall to include the Chevrolet HHR and Pontiac Solstice for model years 2006-2007, Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.  The expansion brought the initial recall total to more than 1.65 million vehicles.

72.    Also on February 24, 2014, the Company submitted a chronology to NHTSA detailing certain of the numerous red flags identified above.   The chronology acknowledged that GM was aware of the problem by at least 2004.

73.    On March 11, 2014, the Company sent an updated chronology to NHTSA.  The updated chronology suggested that GM had discovered the defects in its ignition switch as far back as 2001.  The same day, reports surfaced that the U.S. Department of Justice ("DOJ") had begun a criminal investigation into GM's

decade-long failure to address deadly safety problems in the Company's vehicles. The preliminary inquiry by federal prosecutors in New York focused on whether GM failed to comply with laws requiring timely disclosure of vehicle defects.

74.    On March 17, 2014, GM issued a press release announcing that "GM [r]edoubles [s]afety [e]fforts," and reported further recalls of vehicles including over 1.5 million additional vehicles not previously recalled.  The Company also announced a $300 million charge in the first quarter of 2014 in order to deal with the recall campaigns.

75.    On March 22, 2014, reports surfaced that the DOJ is investigating whether GM hid the ignition switch defect when the Company filed for bankruptcy in 2009.  The DOJ investigation also includes a probe of whether GM committed bankruptcy fraud by not disclosing the ignition problem.   Authorities are also investigating whether GM understated the defect to federal safety regulators.

76.    To date, the Company has admitted that at least thirteen deaths have been linked to the defective ignition switch.  Federal crash data shows that the death toll may be much greater, with over three hundred deaths linked to airbags that failed to deploy on just two of the models that were recalled by the Company. These deaths could have been easily prevented at very little cost to the Company. Indeed, the Company has revealed that the recall would only cost between $2 and $5 per vehicle to produce a replacement ignition switch that can be "swapped out"

in a matter of minutes by GM mechanics.  In fact, according to *Automotive News*, analysts have estimated the cost of the recall repairs to be less than $100 million.

77.    The Individual Defendants failure to timely issue the recall is inexcusable.  As the Company's CEO recently admitted, "[s]omething went very wrong in our processes in this instance, and terrible things happened."

78.    The slow but steady leak of information concerning the Company's failings has proved devastating for GM.  Between February 12, 2014, the day before GM announced the first round of recalls, and March 14, 2014, the last day of trading before the Company promised to "[r]edouble[] [s]afety [e]fforts" thus giving a slight boost to GM's share price, the Company's market cap loss was over $2.3 billion.

## DAMAGES TO GM

79.    As a result of the Individual Defendants' improprieties, GM failed to timely issue a recall for a deadly defect that was identified over a decade ago, thus resulting in multiple personal injury and class action lawsuits against the Company.  Further, at the direction of the Individual Defendants, the Company repeatedly disseminated improper, public statements concerning the safety of its vehicles.  These actions have exposed the Company to billions of dollars in liability.

80.    GM's performance issues also damaged the Company's reputation with its customers, within the business community, and in the capital markets. According to a recent *Consumer Reports* study, the most important factor for car buyers when considering which make and model of car to purchase is safety. Consumers are less likely to purchase vehicles from a company that fails to disclose known and deadly safety issues.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

81.    Further, as a direct and proximate result of the Individual Defendants' actions, GM has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the personal injury and class action lawsuits for injuries and other damages suffered by the Company's customers;

(b)    costs incurred from defending and paying any settlement in the class action for violations of federal securities laws;

(c)    costs incurred from responding to the DOJ investigation;

(d)    costs incurred from fines and/or penalties resulting from the Company's delay in disclosing known defects; and

(e)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to GM.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.    Plaintiff brings this action derivatively in the right and for the benefit of GM to redress injuries suffered, and to be suffered, by GM as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  GM is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

83.    Plaintiff will adequately and fairly represent the interests of GM in enforcing and prosecuting its rights.

84.    Plaintiff was a shareholder of GM at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current GM shareholder.

85.    The current Board of GM consists of the following fourteen individuals: defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson's Conduct Is Not a Valid Exercise of Business Judgment**

86.     Director Defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson's challenged misconduct at the heart of this case jeopardized the safety of millions of people and caused the Company to violate the law, all to save $2 to $5 and a few minutes' worth of repairs per recalled vehicle. As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread improper activities. Causing the Company to violate the law by failing to timely report a known, serious safety defect affecting millions of vehicles and jeopardizing the safety of millions of people is not a valid exercise of business judgment. Accordingly, demand on the Board is excused.

**Demand Is Excused Because Defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson Face a Substantial Likelihood of Liability for Their Misconduct**

87.     As alleged above, defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson breached their fiduciary duties of loyalty by failing to timely report safety defects to regulators and customers, and by making improper statements in the Company's press releases and SEC filings regarding the safety of GM vehicles.

88.   The principle duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations, especially when the safety of its customers is at issue.  For years, however, the Director Defendants ignored a wide array of red flags demonstrating that numerous vehicles in the Company's line-up were plagued with faulty ignition switches that could cause the vehicles to lose power while driving and render the airbags non-operational.  These defendants repeatedly failed to notify GM's customers or provide a remedy for this deadly defect in violation of safety regulations.  These defendants also failed to implement adequate internal controls to ensure that regulators and customers were timely and adequately notified of vehicle defects creating an unreasonable risk to motor vehicle safety or a noncompliance with safety standards.

89.   Defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson also breached their duty of loyalty by causing or allowing the Company to disseminate inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  Each of these defendants signed one or more misleading Form 10-K and caused or allowed the Company to issue multiple misleading Forms 10-Q.  These SEC filings improperly touted the safety of the Company's products, failed to disclose known defects in certain of the Company's vehicles, and misled the investing public regarding the

Company's exposure to litigation and the resulting effects on GM's operations and performance.

90.   A majority of the Board, including defendants Girsky, Davis, Marinello, Telles, Mulva, Mullen, Bonderman, and Isdell, were members of the Public Policy Committee during various times between 2010 and the present. As members of the Public Policy Committee, these defendants were required to review the Company's automotive safety, provide oversight and guidance to management, and discuss and bring to the attention of the Board and management issues that may affect the business operations, profitability, or public image or reputation of the Company. Thus, the Public Policy Committee Defendants were responsible for knowingly or recklessly allowing the Company to violate safety regulations for years and failing to inform GM's customers of deadly defects in the Company's vehicles. Accordingly, the Public Policy Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Public Policy Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

91.   Any suit by the current directors of GM to remedy these wrongs would expose defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson, and GM to

liability for multiple pending personal injury and class action lawsuits, and would result in civil actions being filed against one or more of the other Individual Defendants. If the Board elects for the Company to press forward with its right of action against defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson in this action, then GM's efforts would compromise its defense of the above noted actions. Accordingly, demand on the Board is excused.

92.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by GM's officers and directors and these acts are incapable of ratification.

93.     GM has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for GM any part of the damages GM suffered and will suffer thereby.

94.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for GM for any of the wrongdoing alleged by plaintiff herein.

95.     Plaintiff has not made any demand on the other shareholders of GM to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     GM is a publicly held company with over 1.5 billion shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     The Individual Defendants owed and owe GM fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe GM the highest obligation of good faith, fair dealing, loyalty, and due care.

98.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of

lawlessness within GM, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

99.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  In particular, the Officer Defendants violated their duties of loyalty and care, and the Director Defendants violated their duty of loyalty by: (i) failing to timely and adequately report safety defects to regulators; (ii) failing to timely and adequately inform GM's customers about safety defects; (iii) failing to implement adequate internal controls and procedures to insure timely reporting of safety defects; and (iv) disseminating inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.

100.   As a direct and proximate result of the Individual Defendants breaches of their fiduciary obligations, GM has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

101.   Plaintiff, on behalf of GM, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

102.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.   As a result of the wrongdoing detailed herein, the Individual Defendants have caused GM to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

104.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

105.   Plaintiff, on behalf of GM, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

106.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of GM.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to GM.

108.   Plaintiff, as a shareholder and representative of GM, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

109.   Plaintiff, on behalf of GM, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of GM, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing GM to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GM, its customers, and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.   a proposal to create a Board committee with oversight over safety, inspection, and maintenance matters;

2.     a proposal to appropriately test and then strengthen the Company's internal controls over safety, inspection, and maintenance matters;

3.     a proposal to strengthen the Board's supervision of inspection and maintenance operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.     a proposal to strengthen GM's oversight of its disclosure procedures;

5.     a proposal to ensure the accuracy of the qualifications of GM's directors, executives, and other employees; and

6.     a provision to permit the shareholders of GM to nominate at least four candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of GM has an effective remedy;

D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 28, 2014

MANTESE HONIGMAN ROSSMAN
AND WILLIAMSON, P.C.

GERARD V. MANTESE
DAVID M. HONIGMAN
MARK C. ROSSMAN

1361 E. Big Beaver Road
Troy, MI 48083
Telephone: (248)457-9200
Facsimile: (248) 457-9201
gmantese@manteselaw.com
dhonigman@manteselaw.com
mrossman@manteselaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
JAY N. RAZZOUK
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com
jrazzouk@robbinsarroyo.com

LAW OFFICE OF DEBRA S.
GOODMAN
DEBRA S. GOODMAN
1301 Skippack Pike, Suite 7A #133
Blue Bell, PA 19422
Telephone: (610) 277-6057
Facsimile: (484) 231-1922
debbie419@comcast.net

Attorneys for Plaintiff

940404

- 51 -

## VERIFICATION

I, Richard Hockstein, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:    3/27/14

RICHARD HOCKSTEIN