# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| IN RE GENERAL MOTORS COMPANY SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) ) ) ) | Lead Case No.: 2:14-cv-11277-RHC-MKM |
| | | Judge Robert H. Cleland |
| | | Magistrate Judge Mona K. Majzoub |
| _____ This Document Relates To: ALL ACTIONS _____ | ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |

## VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ...................................................................4

II.     JURISDICTION AND VENUE .............................................................10

III.    THE PARTIES .....................................................................................11

        A.      Plaintiffs ..................................................................................11

        B.      Nominal Defendant ..................................................................12

        C.      Defendants...............................................................................13

IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS .................................33

        A.      Fiduciary Duties ......................................................................33

        B.      Breaches of Duties....................................................................35

V.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED
        ACTION ..............................................................................................37

VI.     SUBSTANTIVE ALLEGATIONS .........................................................39

        A.      Internal Controls Regarding Vehicle Recall and Safety
                Information Were Glaringly Absent at Old GM .................................40

        B.      Following Old GM's Bankruptcy, the New GM Board Assumes
                Control but Fails to Adequately Inform Itself of the Safety
                Problems Plaguing the Company's Vehicles and Fails to Ensure
                that a Vehicle Recall and Safety Information System Is in
                Place, All While Touting GM's Commitment to Safety ....................48

        C.      By Design, GM's Internal Processes and Corporate Culture
                Keep Individual Defendants in the Dark on Safety and Recall
                Matters...................................................................................71

        D.      Lack of Reporting System in GM's Legal Department Prevents
                Individual Defendants from Receiving Information Regarding
                Nature of the Ignition Switch Defect and Related Fatalities ...........79

E.      Changes Made to the Finance and Risk Committee Charter and
        Failure to Comply with the Charter Reflect a Corporate
        Structure Designed to Keep Senior Management and the Board
        in the Dark .......................................................................................87

F.      The Truth Slowly Emerges .............................................................93

G.      GM's Lack of a Vehicle Recall and Safety Information
        Reporting System Results in Maximum Penalty for Violating
        the Safety Act ................................................................................103

H.      Overdue Safety Initiatives Reflect the Long Standing Absence
        of Internal Controls over Vehicle Safety and Recalls......................104

I.      Explosion of GM Recalls Further Confirms Lack of Internal
        Controls ..........................................................................................107

VII.   DAMAGES TO GM.....................................................................................123

VIII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS.................125

A.      Demand Is Excused Because Defendants Barra, Solso, Girsky,
        Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva,
        Mullen, Bonderman, Isdell, and Stephenson's Conduct Is Not a
        Valid Exercise of Business Judgment .............................................126

B.      Demand Is Excused Because Defendants Barra, Solso, Girsky,
        Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva,
        Mullen, Bonderman, Isdell, and Stephenson Face a Substantial
        Likelihood of Liability for Their Misconduct .................................127

IX.    COUNT I — Against the Individual Defendants for Breach of
       Fiduciary Duty .........................................................................................134

X.     COUNT II — Against the Individual Defendants for Waste of
       Corporate Assets.......................................................................................136

XI.    COUNT III — Against the Individual Defendants for Unjust
       Enrichment................................................................................................136

XII.   PRAYER FOR RELIEF ............................................................................137

XIII.  JURY DEMAND........................................................................................139

Plaintiffs, by their attorneys, submit this verified amended consolidated shareholder derivative complaint against the defendants named herein pursuant to the Court's Order Granting Leave to File Amended Consolidated Complaint and Denying Without Prejudice Defendants' Motion to Dismiss, dated August 4, 2017. With the exception of non-substantive factual changes to reflect certain defendants' current positions at the Company, as reflected in paragraphs 19, 27-28, 37 below, this complaint is identical to the proposed Amended Consolidated Complaint attached to Plaintiffs' Motion for Leave to File an Amended Consolidated Complaint, dated February 10, 2017.

Plaintiffs' allegations are based upon information and belief developed from the investigation and analysis of their counsel (except as to the allegations in paragraphs 15-16 below, which are made based on the personal knowledge of each plaintiff specified therein), which include, among other things, public filings by nominal defendant General Motors Company ("GM" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, complaints in federal securities fraud and consumer class actions pending against the Company, a report by counsel hired by GM to investigate matters discussed herein, statements made in connection with investigations by the U.S. Congress, and other information available in the public domain. To the best of plaintiffs' knowledge, information, and belief, the allegations herein not based on personal

knowledge are likely to have evidentiary support after a reasonable opportunity for further investigation, discovery, and analysis.

## I. NATURE OF THE ACTION

1. This is a verified shareholder derivative action brought on behalf of, and for the benefit of, nominal defendant GM against certain of its officers and directors, listed in paragraphs 18-40 below and collectively referred to herein as the "Individual Defendants," for breaches of fiduciary duties, corporate waste, and unjust enrichment, all of which have caused and continue to cause substantial damage to the Company.

2. GM designs, builds, and sells cars, trucks, and automobile parts worldwide. Because GM's officers and directors are entrusted with producing vehicles and parts that will ultimately be used on public roadways, their duties to monitor and oversee the Company's operations required that they implement an internal control system to escalate important matters of safety and regulatory compliance to the highest levels of the Company so that senior management and the Board of Directors (the "Board") remain adequately informed and can promptly act to ensure the safety of GM's vehicles. As detailed herein, however, GM's fiduciaries failed miserably in their duties.

3. Reinforcing the Board's need to be adequately informed about safety, including design defects and vehicle recalls, GM and its Board (which included

2:14-cv-11277-RHC-MKM    Doc # 81    Filed 08/10/17    Pg 6 of 144    Pg ID 1325

each of the Individual Defendants at various times throughout the relevant period) made repeated statements to the public that, among other things, emphasized their commitment to safety.  For example, the Company's website has long touted that "[q]uality and safety are at the top of the agenda at GM," and that "GM proactively design[s] and test[s] features that help keep [its customers] safe and enjoy the drive."  Similarly, year after year in the Company's Annual Reports, the Board (i.e., each of the Individual Defendants) improperly assured the public that GM is "committed to leadership in vehicle design, quality, reliability, telematics and infotainment and *safety*."

4.    As detailed herein, the Individual Defendants had absolutely no basis for making those public statements touting safety, as well as with respect to GM's business and financial condition.  Without an information and reporting system to provide senior management and the Board with safety and recall information, the Individual Defendants were not adequately informed of the necessary material information to comment on safety.  At a minimum, the Individual Defendants had an obligation to conduct a reasonable investigation in good faith to determine whether they had any basis for consistently flaunting the Company's commitment to safety.  As detailed herein, their failure to do so was a breach of their fiduciary duties, and not only caused considerable damage to GM, but also resulted in the tragic deaths of GM consumers.

- 5 -

5.    GM's safety-first image was shattered in February 2014, when the Individual Defendants' false and baseless statements began to be exposed by the belated recall of millions of GM vehicles plagued with a deadly flaw in the ignition switch.  As reported by GM, the recalled cars' ignition switches can easily be knocked out of the "run" position into the "off" or "accessory" position if the key is jostled by a driver's knee, if the key is attached to a heavy key-ring, or if the car simply hits a bumpy patch of road.  The loss of power significantly increases the likelihood of an accident through the commensurate loss in power steering and brake functionality.  To make matters worse, the loss in power also rendered the airbags non-operational.  Thus, after losing control of the vehicle due to the loss of power, passengers would not be protected by the cars' airbags upon impact, and were therefore significantly more prone to severe injuries and fatalities.

6.    GM confirmed that at least thirteen deaths have been linked to the faulty design.  Federal crash data shows that the death toll may be much greater, with over three hundred deaths linked to airbags that failed to deploy on two of the models that were recalled by the Company.

7.    Shockingly, consistent with a chronology that GM provided to safety regulators, GM engineers first documented the faulty ignition switch thirteen years ago and were made aware of the safety defect repeatedly before the February 2014 recall via complaints, investigations, injuries, associated lawsuits, and even deaths.

But by design, this safety information was not escalated to senior management or the Board. As reported by *Reuters*, "**GM built a system to deliberately keep senior executives out of the recall process**." The Individual Defendants are guilty of a sustained and systematic failure to exercise their fiduciary duties to the Company by utterly failing to implement internal controls to keep themselves informed of critical vehicle safety and recall issues and to ensure compliance with related laws and regulations.

8.      This sustained and systematic failure by the Individual Defendants is further confirmed by the findings of former U.S. Attorney Anton R. Valukas ("Valukas"), who issued a report to GM's Board on May 29, 2014 (the "Valukas Report").[1] The Valukas Report revealed a culture within GM that it described as a "proliferation of committees and a lack of accountability." GM trained its employees to avoid the words "defect," "problem," or other words suggesting that any GM-branded vehicles are defective. Similarly, GM employees did not take notes at critical safety meetings because they believed GM lawyers did not want such notes taken. GM's legal department even lacked a reporting system to ensure

---

[1] "Valukas Report" refers to the *Report to Board of Directors of General Motors Company Regarding Ignition Switch Recalls*, Anton R. Valukas, Jenner & Block (May 29, 2014). The Valukas Report is the result of Anton R. Valukas and Jenner & Block's investigation into the circumstances that led up to the recall due to the faulty ignition switch.

that information regarding fatalities and the nature of defects would be escalated to senior management (including GM's General Counsel) and the Board.

9.      The defective reporting structure and culture of ignorance did what it was designed to do: keep senior management and the Board in the dark.  The Valukas Report found that "[w]hile the issue of the ignition switch passed through numerous hands at GM, from engineers to investigators to lawyers, ***nobody raised the problem to the highest levels of the company***."  Defendant Mary T. Barra ("Barra"), GM's current Chief Executive Officer ("CEO"), acknowledged that, "[i]f this information had been disclosed, I believe in my heart the company would have dealt with this matter appropriately," but instead the lack of any vehicle safety and recall reporting information system promoted "the willingness of others in the company to condone bureaucratic processes that avoided accountability," resulting in "nobody rais[ing] the problem to the highest levels of the company."  Defendant Michael P. Millikin ("Millikin"), GM's General Counsel, admitted that he did not know of the ignition-switch defect until February 2014, ***nor was he aware of litigation involving fatal accidents linked to the defect***.  GM admitted that it has only ***now*** "[r]estructured the recall decision making process to raise it to the highest levels of the company."  Thus, until recently, the Individual Defendants failed to implement the safety and recall reporting and information system necessary for

them to satisfy their fiduciary duties in the first place – all while consistently touting GM's purported commitment to safety.

10.    The Individual Defendants' failure to implement a reporting and information system to oversee safety, recalls, and related compliance issues is also egregious in light of The National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act").[2]  The Safety Act requires that manufacturers notify owners of vehicles and provide a remedy for any vehicle defect that creates an unreasonable risk to motor vehicle safety or noncompliance with a safety standard.  Automakers are also required to promptly report safety defects to the National Highway Traffic Safety Administration ("NHTSA") within five days of discovering them.  The Individual Defendants had a duty to implement internal controls to ensure and oversee compliance with the Safety Act.  Their failure to do so resulted in GM's failure to abide by its legal obligations under the Safety Act.  On May 16, 2014, GM entered into a Consent Order with NHTSA in which the Company admitted that it violated the Safety Act by not disclosing the ignition switch defect, and agreed to pay $35 million, ***the maximum available civil penalty*** for its violations. The Individual Defendants cannot, in good faith, claim ignorance of their obligation to ensure GM has proper controls in place to ensure compliance with applicable

---

[2] 49 U.S.C. §30101.

laws and regulations.    Indeed, between 2010 and 2014, they repeatedly acknowledged the reporting and recall obligations imposed by the Safety Act.

11.    In short, while internal controls to inform the Board of critical vehicle safety and recall issues were entirely absent, GM promoted a culture where safety issues were swept under the rug and the Individual Defendants repeatedly touted their commitment to safety.  As a direct result of this unlawful course of conduct, the Company is now the subject of a criminal investigation launched by the U.S. Department of Justice ("DOJ"), numerous lawsuits, including various personal injury suits and consumer class action suits relating to the dangerous ignition switch defect, as well as at least one federal securities class action lawsuit filed on behalf of investors who purchased GM's shares.

## II.    JURISDICTION AND VENUE

12.    Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) GM maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to GM, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   THE PARTIES

### A.     Plaintiffs

15.     Plaintiff The Police Retirement System of St. Louis became a shareholder of GM on or around November 23, 2010, has continuously been a GM shareholder since that time, and is a current GM shareholder.  Thus, plaintiff The Police Retirement System of St. Louis was a shareholder of GM at the time of, and has continuously been a shareholder since, the continuous wrongdoing alleged herein, including the Individual Defendants' sustained and systematic failure to implement internal controls to keep them informed of critical vehicle safety and recall issues, and their improper public statements, including their assurances that the Company was committed to safety.  Plaintiff The Police Retirement System of St. Louis is run by a board of trustees for the advantage of its beneficiaries.  There

are nine trustees and they are all citizens of Missouri.  Accordingly, plaintiff The Police Retirement System of St. Louis is a citizen of Missouri.

16.    Plaintiff Richard Hockstein ("Hockstein") became a shareholder of GM on April 25, 2011, has continuously been a GM shareholder since that time, and is a current GM shareholder.  Thus, plaintiff Hockstein was a shareholder of GM at the time of, and has continuously been a shareholder since, the continuous wrongdoing alleged herein, including the Individual Defendants' sustained and systematic failure to implement internal controls to keep them informed of critical vehicle safety and recall issues, and their improper public statements, including their assurances that the Company was committed to safety.   Plaintiff Hockstein is a citizen of Pennsylvania.

### B.    Nominal Defendant

17.    Nominal Defendant GM is a Delaware corporation with principal executive offices located at 300 Renaissance Center, Detroit, Michigan. Accordingly, GM is a citizen of Delaware and Michigan.  GM designs, builds, and sells cars, trucks, and automobile parts worldwide.  GM also provides automotive financing services through the General Motors Financial Company, Inc.  GM was incorporated in Delaware in 2009 after acquiring substantially all of the assets and assuming certain liabilities of General Motors Corporation ("Old GM"), its predecessor company, from a section 363 sale under Chapter 11 of the U.S.

- 12 -

Bankruptcy Code ("363 Sale").  Upon completion of the 363 Sale, Old GM was renamed Motors Liquidation Company, which was dissolved on December 15, 2011.

### C.    Defendants

18.    Defendant Mary T. Barra is GM's CEO and a director and has been since January 2014.  Defendant Barra was also GM's Executive Vice President, Global Product Development, Purchasing & Supply Chain from August 2013 to January 2014; Senior Vice President, Global Product Development from February 2011 to August 2013; Vice President, Global Human Resources from July 2009 to February 2011; Vice President, Global Manufacturing Engineering from February 2008 to July 2009; and Executive Director, Vehicle Manufacturing from January 2005 to February 2008.  Defendant Barra knowingly, recklessly, or with gross negligence: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  For example, defendant Barra, as an officer and director of the Company, knowingly, recklessly, or with gross negligence reviewed, approved, signed, and certified as reliable pursuant to sections 302 and 906 of the Sarbanes-

Oxley Act of 2002 ("SOX") the Company's misleading Annual Report filed on Form 10-K for fiscal year 2013 (filed on February 6, 2014). GM paid defendant Barra the following compensation as an executive and/or director between 2012 and 2014:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and NQ Deferred Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------------------------------------|------------------------|-------|
| 2014 | $1,567,803 | $11,760,567 | $2,072,000 | $349,926 | $412,532 | $16,162,828 |
| 2013 | $750,000 | $4,446,504 | - | - | $36,636 | $5,233,140 |
| 2012 | $750,000 | $3,906,484 | - | $258,558 | $28,445 | $4,943,487 |

Defendant Barra is a citizen of Michigan.

19.     Defendant Theodore M. Solso ("Solso") is GM's Independent Lead Director and has been since January 2016 and a director and has been since June 2012. Defendant Solso was Chairman of the Board from at least January 2014 to January 2016. Defendant Solso was also a member of GM's Audit Committee and from at least April 2013 to at least April 2014. Defendant Solso knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Solso the following compensation as a director between 2012 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2013 | $220,000 | $7,133 | $227,133 |
| 2012 | $128,333 | $6,965 | $135,298 |

Defendant Solso is a citizen of Indiana.

20.    Defendant Stephen J. Girsky ("Girsky") was a GM director from July 2009 until June 2016.  Defendant Girsky was also GM's Vice Chairman of Corporate Strategy, Business Development, Global Product Planning, and Global Purchasing and Supply Chain from February 2011 to January 2014; Vice Chairman of Corporate Strategy and Business Development from March 2010 to February 2010; Interim President of GM Europe from July 2012 to February 2013; and a senior advisor of GM until April 2014.  Defendant Girsky was also a member of GM's Public Policy Committee from August 2010 to June 2015.  Defendant Girsky knowingly, recklessly, or with gross negligence: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  GM paid defendant Girsky the following compensation as an executive between 2010 and 2013:

| Year | Salary | Stock Awards | Change in Pension Value and NQ Deferred Compensation | All Other Compensation | Total |
|------|--------|--------------|------------------------------------------------------|------------------------|-------|
| 2013 | $600,000 | $5,757,077 | $1,542 | $30,965 | $6,389,584 |
| 2012 | $600,000 | $4,811,291 | $435 | $34,578 | $5,446,304 |
| 2011 | $600,000 | $4,682,223 | $2,987 | $24,583 | $5,309,793 |
| 2010 | $416,667 | $3,225,000 | $6,782 | $63,609 | $3,712,058 |

Defendant Girsky is a citizen of New York.

21.    Defendant Patricia F. Russo ("Russo") is a GM director and has been since July 2009. Defendant Russo was also GM's Lead Director form March 2010 to January 2014. Defendant Russo knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Russo the following compensation as a director between 2010 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2013 | $240,000 | $7,133 | $247,133 |
| 2012 | $240,000 | $11,957 | $251,957 |
| 2011 | $240,000 | $8,876 | $248,876 |
| 2010 | $218,333 | $8,145 | $226,478 |

Defendant Russo is a citizen of Florida.

22.    Defendant Thomas M. Schoewe ("Schoewe") is a GM director and has been since November 2011. Defendant Schoewe is also Chairman of GM's Audit Committee and has been since February 2013. Defendant Schoewe knowingly or

recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Schoewe the following compensation as a director between 2011 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|------|------|------|
| 2013 | $228,333 | $7,133 | $235,466 |
| 2012 | $211,667 | $11,957 | $223,624 |
| 2011 | $33,333 | $740 | $34,073 |

Defendant Schoewe is a citizen of Florida.

23.    Defendant Erroll B. Davis, Jr. ("Davis") was a GM director from at least July 2009 to at least June 2015. Defendant Davis was also a director of Old GM from 2007 to 2009. Defendant Davis was a member of GM's Audit Committee from August 2010 to June 2015 and Chairman of the Public Policy Committee from April 2011 to June 2015. Defendant Davis knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety,

- 17 -

as well as with respect to GM's business and financial condition. GM paid defendant Davis the following compensation as a director between 2010 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2013 | $230,000 | $7,857 | $237,857 |
| 2012 | $230,000 | $13,074 | $243,074 |
| 2011 | $230,000 | $10,101 | $240,101 |
| 2010 | $220,000 | $9,312 | $229,312 |

Defendant Davis is a citizen of Georgia.

24.    Defendant Kathryn V. Marinello ("Marinello") was a GM director from July 2009 to December 2016. Defendant Marinello was also a director of Old GM from 2007 to 2009. Defendant Marinello was a member of GM's Audit Committee and Public Policy Committee from August 2010 to June 2015. Defendant Marinello knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. GM paid defendant Marinello the following compensation as a director between 2010 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2013 | $220,000 | $7,133 | $227,133 |
| 2012 | $220,000 | $11,957 | $231,957 |
| 2011 | $220,000 | $8,876 | $228,876 |
| 2010 | $206,667 | $8,145 | $214,812 |

Defendant Marinello was a citizen of Minnesota at the time this action was filed and is now a citizen of Florida.

25.     Defendant Robert D. Krebs ("Krebs") was a GM director from at least July 2009 to June 2014.  Defendant Krebs was also a member of GM's Audit Committee from at least September 2010 to at least April 2014.  Defendant Krebs retired from the Board at the Company's 2014 Annual Meeting of Stockholders ("2014 Annual Meeting").  Defendant Krebs knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.   GM paid defendant Krebs the following compensation as a director between 2010 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2013 | $230,000 | $7,133 | $237,133 |
| 2012 | $230,000 | $11,957 | $241,957 |
| 2011 | $230,000 | $8,876 | $238,876 |
| 2010 | $208,333 | $8,145 | $216,478 |

Defendant Krebs is a citizen of Illinois.

26.     Defendant Cynthia A. Telles ("Telles") was a GM director from at least April 2010 to at least June 2014.  Defendant Telles was also a member of GM's Public Policy Committee from at least August 2010 to at least April 2014.

Defendant Telles knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.    GM paid defendant Telles the following compensation as a director between 2010 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2013 | $200,000 | $7,133 | $207,133 |
| 2012 | $200,000 | $11,957 | $211,957 |
| 2011 | $200,000 | $8,876 | $208,876 |
| 2010 | $150,000 | $4,761 | $154,761 |

 Defendant Telles is a citizen of California.

27.    Defendant James J. Mulva ("Mulva") is a GM director and has been since June 2012.  Defendant Mulva was also a member of GM's Public Policy Committee from at least April 2013 until June 2015.  Defendant Mulva knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and

financial condition.  GM paid defendant Mulva the following compensation as a director between 2012 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2013 | $200,000 | $3,042 | $203,042 |
| 2012 | $116,667 | $60 | $116,727 |

Defendant Mulva is a citizen of Texas.

28.    Defendant Michael G. Mullen ("Mullen") is a GM director and has been since February 2013.  Defendant Mullen is also a member of GM's Audit Committee and has been since at least April 2014.  Defendant Mullen was also a member of GM's Public Policy Committee from at least April 2014 until June 2016. Defendant Mullen knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  Defendant Mullen is a citizen of Maryland.

29.    Defendant David Bonderman ("Bonderman") was a GM director from at least July 2009 to at least June 2014.  Defendant Bonderman was also a member of GM's Public Policy Committee in at least August 2010.  Defendant Bonderman knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and

recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  GM paid defendant Bonderman the following compensation as a director between 2010 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2013 | $200,000 | $5,964 | $205,964 |
| 2012 | $200,000 | $11,957 | $211,957 |
| 2011 | $200,000 | $8,876 | $208,876 |
| 2010 | $83,333 | $8,145 | $91,478 |

Defendant Bonderman is a citizen of Texas.

30.    Defendant E. Neville Isdell ("Isdell") was a GM director from at least July 2009 until at least June 2015.  Defendant Isdell was also a director of Old GM from 2008 to 2009.  Defendant Isdell was a member of GM's Public Policy Committee from at least August 2010 to at least April 2013 and was Chairman of that Committee in at least August 2010.  Defendant Isdell knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  GM

paid defendant Isdell the following compensation as a director between 2010 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|---|---|---|---|
| 2013 | $210,000 | $7,133 | $217,133 |
| 2012 | $210,000 | $11,957 | $221,957 |
| 2011 | $210,000 | $8,876 | $218,876 |
| 2010 | $210,000 | $8,145 | $218,145 |

Defendant Isdell is a citizen of Georgia.

31.    Defendant Carol M. Stephenson ("Stephenson") is a GM director and has been since July 2009.  Defendant Stephenson knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  GM paid defendant Stephenson the following compensation as a director between 2010 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|---|---|---|---|
| 2013 | $200,000 | $7,133 | $207,133 |
| 2012 | $200,000 | $11,957 | $211,957 |
| 2011 | $200,000 | $8,876 | $208,876 |
| 2010 | $200,000 | $8,145 | $208,145 |

Defendant Stephenson is a citizen of Canada.

32.     Defendant Daniel F. Akerson ("Akerson") was GM's CEO from September 2010 to January 2014; Chairman of the Board from January 2011 to January 2014; and a director from July 2009 to January 2014. Defendant Akerson was also a member of GM's Audit Committee from at least August 2010 to September 2010. Defendant Akerson knowingly, recklessly, or with gross negligence: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. For example, defendant Akerson, as an officer and director of the Company, knowingly, recklessly, or with gross negligence reviewed, approved, signed, and certified as reliable pursuant to sections 302 and 906 of SOX the Company's misleading Annual Reports filed on Forms 10-K for fiscal years 2012, 2011, and 2010 (filed on February 15, 2013; February 27, 2012; and March 1, 2011, respectively). Defendant Akerson, as an officer of the Company, also knowingly, recklessly, or with gross negligence reviewed, approved, and certified as certified as reliable pursuant to sections 302 and 906 of SOX the Company's misleading Quarterly Reports on Forms 10-Q for its third quarter during fiscal year 2010, and its first, second, and third quarters during fiscal years 2011, 2012, and 2013 (filed

on November 10, 2010; May 6, 2011; August 5, 2011; November 9, 2011; May 3, 2012; August 3, 2012; October 31, 2012, May 2, 2013; July 25, 2013; and October 30, 2013, respectively).  GM paid defendant Akerson the following compensation as an executive and/or director between 2010 and 2014:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and NQ Deferred Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2014 | $850,000 | - | $1,100,800 | - | $148,453 | $2,099,253 |
| 2013 | $1,700,000 | $7,302,206 | - | $2,833 | $66,270 | $9,071,309 |
| 2012 | $1,700,000 | $9,332,659 | - | - | $70,149 | $11,102,808 |
| 2011 | $1,700,000 | $5,947,229 | - | - | $55,514 | $7,702,743 |
| 2010 | $566,667 | $1,766,664 | - | - | $194,088 | $2,527,419 |

Defendant Akerson is a citizen of Virginia.

33.    Defendant Edward E. Whitacre, Jr. ("Whitacre") was GM's CEO from December 2009 to September 2010 and Chairman of the Board from July 2009 to December 2010.    Defendant Whitacre knowingly, recklessly, or with gross negligence: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.    For example, defendant Whitacre, as an officer and director of the Company, knowingly, recklessly, or with gross negligence reviewed, approved, signed, and certified as reliable pursuant to sections 302 and 906 of SOX the

Company's misleading Annual Report filed on Form 10-K for fiscal year 2010 (filed on April 7, 2010).  Defendant Whitacre, as an officer of the Company, also knowingly, recklessly, or with gross negligence reviewed, approved, and certified as certified as reliable pursuant to sections 302 and 906 of SOX the Company's misleading Quarterly Reports on Form 10-Q for its second and third quarters during fiscal year 2010 (filed May 17, 2010, and August 16, 2010, respectively).  GM paid defendant Whitacre the following compensation as an executive and/or director in 2010:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2010 | $1,133,333 | $3,533,330 | $336,417 | $5,003,080 |

 Defendant Whitacre is a citizen of Texas.

34.    Defendant Philip A. Laskawy ("Laskawy") was a GM director from July 2009 to June 2013 and a director of Old GM from 2003 to 2009.  Defendant Laskawy was also Chairman of GM's Audit Committee from at least August 2010 to at least April 2012.  Defendant Laskawy knowingly or recklessly: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.   GM paid

defendant Laskawy the following compensation as a director between 2010 and 2013:

| Year | Fees Paid in Cash | All Other Compensation | Total |
|------|-------------------|------------------------|-------|
| 2013 | $105,000 | $7,073 | $112,073 |
| 2012 | $230,000 | $12,912 | $242,912 |
| 2011 | $230,000 | $8,876 | $238,876 |
| 2010 | $230,000 | $8,145 | $238,145 |

Defendant Laskawy is a citizen of Connecticut.

35.     Defendant Daniel Ammann ("Ammann") is GM's President and has been since January 2014.  Defendant Ammann was also GM's Executive Vice President and Chief Financial Officer ("CFO") from June 2013 to January 2014; Senior Vice President and CFO from April 2011 to June 2013; and Vice President, Finance, and Treasurer from April 2010 to April 2011.  In these capacities, defendant Ammann was responsible for, among other things, reviewing, verifying, and attesting to the reliability of the information contained in the Company's financial statements.  Defendant Ammann knowingly, recklessly, or with gross negligence disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  For example, defendant Ammann knowingly, recklessly, or with gross negligence reviewed, approved, and signed the Company's misleading Annual Reports filed on Forms 10-K for fiscal years 2012 and 2011 (filed on February 15, 2013, and February 27, 2012, respectively).  Similarly,

defendant Ammann knowingly, recklessly, with gross negligence reviewed, approved, and certified as reliable pursuant to sections 302 and 906 of SOX the Company's misleading Quarterly Reports filed on Forms 10-Q for its first, second, and third quarters during fiscal years 2011, 2012, and 2013 (filed on May 6, 2011; August 5, 2011; November 9, 2011; May 3, 2012; August 3, 2012; October 31, 2012, May 2, 2013; July 25, 2013; and October 30, 2013, respectively).  GM paid defendant Ammann the following compensation as an executive between 2011 and 2014:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and NQ Deferred Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------------------------------------|------------------------|-------|
| 2014 | $990,530 | $6,310,564 | $925,000 | - | $263,252 | $8,489,346 |
| 2013 | $750,000 | $4,481,562 | - | - | $28,475 | $5,260,037 |
| 2012 | $750,000 | $4,007,056 | - | - | $31,810 | $4,788,866 |
| 2011 | $687,500 | $2,789,832 | - | $354 | $30,507 | $3,508,193 |

Defendant Ammann is a citizen of Michigan.

36.    Defendant Charles K. Stevens, III ("Stevens") is GM's Executive Vice President and CFO and has been since January 2014.  Defendant Stevens was also GM North America's CFO from January 2010 to January 2014; GM South America's interim CFO from December 2011 to January 2013; and held other various positions at GM and Old GM's subsidiaries and affiliates beginning in 1983. In these capacities, defendant Stevens was responsible for, among other things, reviewing, verifying, and attesting to the reliability of the information contained in the Company's financial statements.  Defendant Stevens knowingly, recklessly, or

with gross negligence disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  For example, he knowingly, recklessly, or with gross negligence reviewed, approved, signed, and certified as reliable pursuant to sections 302 and 906 of SOX the Company's misleading Annual Report filed on Form 10-K for fiscal year 2013 (filed on February 6, 2014).  GM paid defendant Stevens the following compensation as an executive in 2014:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and NQ Deferred Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------------------------------------|------------------------|-------|
| 2014 | $691,667 | $3,177,354 | $647,500 | $265,201 | $113,110 | $4,894,832 |

Defendant Stevens is a citizen of Michigan.

37.    Defendant Thomas S. Timko ("Timko") is GM's Vice President, Global Business Services and has been since July 1, 2017.  Defendant Timko is also GM's Vice President, Controller, and Chief Accounting Officer and has been since March 2013.  In this capacity, he was, and is, responsible for the oversight and preparation of the Company's financial reports.  Defendant Timko's duties during the relevant period included the following: oversight of external reporting; oversight of technical accounting matters; oversight for development of accounting policies; and oversight of internal controls.    Defendant Timko knowingly, recklessly, or with gross negligence: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform himself and others in

management of critical vehicle safety and recall issues; and (ii) disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. For example, Defendant Timko knowingly, recklessly, or with negligence oversaw review, approved, and signed the Company's misleading Annual Report on Form 10-K for fiscal year 2013 (filed February 6, 2014). Similarly, defendant Timko knowingly, recklessly, or with gross negligence reviewed, approved, and signed the Company's misleading Quarterly Reports filed on Form 10-Q for its first, second, and third quarters during fiscal year 2013 (filed on May 2, 2013; July 25, 2013; and October 30, 2013, respectively). Defendant Timko is a citizen of Michigan.

38.    Defendant Nicholas S. Cyprus ("Cyprus") was GM's Vice President, Controller, and Chief Accounting Officer from August 2009 to July 2013. Defendant Cyprus was also Old GM's Controller and Chief Accounting Officer from December 2006 to August 2009. In his capacity as Controller and Chief Accounting Officer, he was responsible for the oversight and preparation of the Company's financial reports. Defendant Cyprus knowingly, recklessly, or with gross negligence disseminated inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. For example, defendant Cyprus knowingly, recklessly, or with negligence reviewed, approved, and signed the Company's misleading Annual

Reports filed on Forms 10-K for the fiscal years 2012, 2011, 2010, and 2009 (filed February 15, 2013; February 27, 2012; March 1, 2011; and April 7, 2010, respectively).  Similarly, defendant Cyprus knowingly, recklessly, or with gross negligence oversaw the reviewed, approved, and signed the Company's misleading Quarterly Reports filed on Forms 10-Q for its first, second, and third quarters during fiscal years 2012, 2011, and 2010 (filed on May 17, 2010; August 16, 2010; November 10, 2010; May 6, 2011; August 5, 2011; November 9, 2011; May 3, 2012; August 3, 2012; and October 31, 2012, respectively).  Defendant Cyprus is a citizen of New Jersey.

39.    Defendant Michael P. Millikin was GM's Vice President and General Counsel from July 2009 to March 2015; Old GM's Associate General Counsel from June 2005 to July 2009; and Assistant General Counsel from June 2001 to June 2005.  Defendant Millikin also held various other positions at Old GM beginning in 1977.  In his capacity as General Counsel, defendant Millikin was responsible for, among other things, ensuring legal compliance and shielding the Company from potential legal proceedings.  In written testimony presented during a July 17, 2014 Senate hearing, defendant Millikin admitted "[a]s General Counsel, I am ultimately responsible for the legal affairs of the company."  Defendant Millikin knowingly, recklessly, or with gross negligence: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical

vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) caused the dissemination of inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. During the aforementioned July 17, 2014 Senate hearing, Senator Claire McCaskill described defendant Millikin's failure to know about the ignition-switch defect as "either gross negligence or gross incompetence." Senator Dean Heller concurred, in a *Wall Street Journal* article, saying of defendant Millikin that "[e]ven if he didn't know, he had an obligation to know." GM paid defendant Millikin the following compensation as an executive in 2014:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and NQ Deferred Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------------------------------------|------------------------|-------|
| 2014 | $692,235 | $4,127,946 | $647,500 | $179,184 | $118,666 | $5,765,531 |

Defendant Millikin is a citizen of Michigan.

40.    Defendant Brian Thelen ("Thelen") was GM's General Auditor from August 2011 to March 2015, and GM's Chief Risk Officer from September 2011 to August 2014. As GM's General Auditor, defendant Thelen's duties included, but were not limited to: coordination of global audit activity with other GM assurance functions; management of Audit Committee reporting and relationships, including orientation of new directors; and implementation of SOX quality assurance/ validation programs. As GM's Chief Risk Officer, defendant Thelen's duties

included, but were not limited to: facilitating identification of key risks and mitigation activities; and facilitating analysis and consideration of unseen/unknown risks. Defendant Thelen knowingly, recklessly, or with gross negligence: (i) failed to implement a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations; and (ii) caused the dissemination of inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. Defendant Thelen is a citizen of Indiana.

41.    The defendants identified in ¶¶18-34 are referred to herein as the "Director Defendants." The defendants identified in ¶¶18, 20, 32-33, 35-40 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶18-38 are referred to herein as the "False Statement Defendants." Collectively, the defendants identified in ¶¶18-40 are referred to herein as the "Individual Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS
### A.    Fiduciary Duties

42.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe GM and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GM in a fair, just, honest, and

equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of GM and not in furtherance of their personal interest or benefit.

43.   To discharge their duties, the officers and directors of GM were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of GM were required to, among other things:

(a)   ensure the Company complied with its legal obligations and requirements, including by notifying vehicle owners and providing a remedy for any vehicle defect that creates an unreasonable risk to motor vehicle safety or a noncompliance with a safety standard and reporting safety defects to the NHTSA within five days of discovering them;

(b)   conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   remain informed as to how GM conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to

correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(d)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; and

(e)    properly and accurately guide investors and analysts as to the true condition of the Company at any given time, including making accurate statements about the Company's compliance with applicable laws.

**B.    Breaches of Duties**

44.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of GM, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

45.    Delaware law is quite clear regarding a director's duty to implement internal controls: Directors have a responsibility to assure that appropriate information and reporting systems are established and implemented so that senior management and the board of directors have adequate information on the company's business and operations, material events, and compliance with applicable statutes and regulations.    A failure to implement such a system constitutes a breach of the duty of loyalty.

46.    The Individual Defendants breached their duty of loyalty and good faith, as well as their duty of care to the extent they were officers of the Company, by allowing defendants to cause, or by themselves causing, the Company to lack a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations.  Similarly, the False Statement Defendants breached their duty of loyalty and good faith, as well as their duty of care to the extent they were officers of the Company, by disseminating inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.  These improper practices wasted the Company's assets and caused GM to incur substantial damage.

47.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of GM, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, GM has expended, and will continue to expend, significant sums of money.

## V.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of GM, regarding the Individual Defendants' management of GM's operations and the safety of the Company's vehicles; and (ii) enhance the Individual Defendants' executive and directorial positions at GM and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

50.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to fail to implement a vehicle recall and safety

reporting information system while repeatedly issuing improper statements regarding safety.

51.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

52.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by failing to implement any vehicle recall and safety reporting information system leading to the Board being totally unaware of unprecedented safety problems, and while falsely touting GM's commitment to safety.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing,

substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VI.    SUBSTANTIVE ALLEGATIONS

54.    GM recently submitted a chronology to the NHTSA detailing the Company's discovery and investigations of the ignition switch and airbag problems. As described below, the chronology demonstrates that from at least 2001 through 2014, the Company steadily received multiple reports of serious defects with the ignition switches on many of the recalled vehicles that can cause the vehicles to lose power while driving.  In particular, the cars' ignition switch can easily be knocked out of the "run" position into the "off" or "accessory" position if the key is jostled by a driver's knee, if the keys are overly weighted by other keys attached to the key ring, or if the car simply hits a bumpy patch of road.  The loss of power can result in a loss of power breaking and power steering, and further renders the airbags non-operational.  This ignition system flaw caused passengers in GM vehicles to be significantly more susceptible to severe injuries and fatalities.

55.    Despite the paramount importance of vehicle safety, GM's officers and directors, including the Individual Defendants, were satisfied with remaining ignorant of any safety defects.  Indeed, as fiduciaries of the Company, the Individual Defendants were responsible for implementing a vehicle safety and recall information reporting system necessary to adequately inform the Board of

critical vehicle safety and recall issues and to ensure the timely reporting of safety defects. Yet, as the Valukas Report concluded, "[w]hile the issue of the ignition switch passed through numerous hands at GM, from engineers to investigators to lawyers, nobody raised the problem to the highest levels of the [C]ompany. As a result, those in the best position to demand quick answers, [the Individual Defendants], did not know questions needed to be asked."[3] Indeed, this was because GM lacked an internal control environment that would have kept the Board informed about safety issues and enabled the Board to oversee and monitor critical recall determinations. Rather, as GM has described the way things were at the Company for a long time, "smaller groups of lower-level company executives are responsible for leading a recall." As such, the Individual Defendants utterly failed to fulfill their fiduciary duties by consciously failing to implement the internal controls to remain adequately informed and ensure compliance with applicable laws and regulations while blindly promoting the Company's commitment to safety.

## A. Internal Controls Regarding Vehicle Recall and Safety Information Were Glaringly Absent at Old GM

56.    Between 2001 and 2009, GM's predecessor company, Old GM, was awash with information concerning the faulty ignition switches and failing airbags

---

[3] Valukas Report at 4.

of the Company's vehicles but the lack of any reporting system prevented this information from reaching the Board.

57.    From the start, the ignition switch "had significant problems that were known to GM personnel," but were not escalated to senior management or the Board.[4] A GM engineer, Ray DeGiorgio ("DeGiorgio"), with the purported authority to approve the ignition switch, approved it "even though it did not comply with all Specification requirements, without needing anyone else to sign off on his approval decision."[5]    As the Valukas Report found, "[t]here are inconsistent accounts of whether practices at the time required someone else also to approve the switch and whether GM required documentation of a deviation from Specifications. However, no evidence has been uncovered that suggests that any GM employee, other than [DeGiorgio], knew, prior to production, that the Ignition Switch approved for the Ion and Cobalt was below specification."[6]    The Valukas Report concluded, that "[t]he failure to document and track such authorization impeded investigators in future years."[7]

---

[4] Valukas Report at 5.

[5] *Id.* at 51.

[6] *Id.* at 51-52.

[7] *Id.* at 53.

58.    One report initiated in 2001, during pre-production development of the Saturn Ion, addressed an issue relating to the ignition switch's "passlock" system. The report stated that the causes of the problem included "low detent plunger force" in the ignition switch, but stated that an ignition switch design change had resolved the problem.   Although the problem was purportedly resolved, a 2003 report documented an instance in which a service technician observed a stall while driving, noted that "[t]he owner had several keys on the key ring," and stated that "[t]he additional weight of the keys had worn out the ignition switch."   In that instance, the technician replaced the ignition switch and the report was closed. Various other reports collected at the time, along with the warranty and technical assistance data collected in support of these reports, included complaints of stalling. The Company, however, did not investigate the issue further at that time.   Nor did anyone escalate the issue to senior management or the Board.

59.    In 2004, around the time of the launch of the 2005 Chevrolet Cobalt, the Company learned of at least one incident in which a Chevrolet Cobalt lost engine power because the key moved out of the "run" position when the driver inadvertently contacted the key or steering column. The Company's employees were able to replicate this phenomenon during test drives and when an engineering inquiry, known within the Company as a Problem Resolution Tracking System inquiry ("PRTS"), was opened to investigate the issue.   Engineers believed that low

key cylinder torque effort was an issue and considered a number of potential solutions. Nonetheless, the PRTS was ultimately closed with no action and no escalation to senior management or the Board.

60.    In 2005, employees received new field reports of Chevrolet Cobalts losing engine power, including instances in which the key moved out of the "run" position when a driver inadvertently contacted the key or steering column. Additional PRTSs were opened to assess this issue. During the course of a PRTS opened in May 2005, an engineer proposed that GM redesign the key head from a "slotted" to a "hole" configuration to address the problem. That proposal was initially approved, but later canceled. Again, nothing was reported to senior management or the Board.

61.    On July 29, 2005, Amber Marie Rose, sixteen years old, died in a crash when the airbag in a 2005 Chevrolet Cobalt failed to deploy. Ms. Rose's death was the first that has been officially linked to the faulty ignition switch. The Company's Legal Staff opened a file relating to this crash in September 2005 but never escalated the matter to senior management or the Board.

62.    Rather than redesign the key head and recall the vehicles that were known to suffer from this dangerous flaw, the Company instead merely issued a service bulletin in December 2005, which applied to a number of vehicles that were equipped with the same ignition switch, including vehicles subject to the recall.

The service bulletin specifically applied to: 2005-2006 Chevrolet Cobalt, 2003-2006 Saturn Ion, 2006 Chevrolet HHR, and 2006 Pontiac Solstice.  Consistent with GM's culture of avoiding responsibility, the service bulletin attempted to shift the responsibility of preventing catastrophic and potentially fatal ignition failure to the Company's dealers and customers.  In particular, the service bulletin informed dealers that "there is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort"; "[t]he concern is more likely to occur if the driver is short and has a large and/or heavy key chain"; and "the customer should be advised of this potential and should take steps to prevent it – such as removing unessential items from their key chain."  The service bulletin also advised dealers that "[e]ngineering has come up with an insert for the key ring" that would help prevent the issue, but did not mandate or otherwise require installation of the insert.

63.    Worse, as the Valukas Report found, the service bulletin "did not refer to the problem as 'stalling' … precisely because GM believed customers might associate stalling with a safety problem."[8]  According to Steve Oakley, GM's Brand Quality Manager, "the term 'stall' is a 'hot' word that GM generally does not use in bulletins because it may raise a concern about vehicle safety, which suggests GM

_____

[8] Valukas Report at 8.

should recall the vehicle, not issue a bulletin."[9]  Mr. Oakley admitted "that he was reluctant to push hard on safety issues because of his perception that his predecessor had been pushed out of the job for doing just that."[10]

64.    Thus, the bulletin "did not solve the problem."  As the Valukas Report explained, in relevant part:

> In order for a GM vehicle owner to learn of the suggested service fix (*i.e.*, removal of excess weight from the key chain) and to obtain a key insert plug and smaller key ring, (1) the customer had to experience a moving stall; (2) the customer had to go to the dealership to complain of the issue; (3) the technician at the dealership had to diagnose the issue properly; and (4) the technician had to search GM's bulletin database to identify the applicable bulletin without using the term 'stall' since the word would not appear in the [bulletin] as issued.  The odds were not with the consumer.[11]

As a result, "Cobalts stayed on the road with a safety defect that could have been addressed many years earlier."[12]  Indeed GM's warranty records indicate that the inserts were only provided to 474 customers who brought their vehicles into dealers for service.  Later, in 2014, GM initiated several recalls to install inserts in key rings as done on these 474 customers in or around 2006.

---

[9] *Id*. at 92.

[10] *Id.* at 93.

[11] *Id.* at 93-94.

[12] *Id.* at 95.

65.    On April 26, 2006, the GM design engineer responsible for the Chevrolet Cobalt's ignition switch, DeGiorgio, signed a document approving changes to the ignition switch to prevent further failures, including the use of new parts that increased torque force in the switch.  However, testing showed that, even with the proposed change, the performance of the ignition switch was still below original specifications.

66.    The modified ignition switches began to be installed starting with 2007 model year vehicles, but the Company did not issue a recall for the vehicles using the older, faulty ignition system.  Worse, although GM changed the part design, it kept the old part number.  That made it impossible to determine from the part number alone which GM vehicles produced after 2007 contain the defective ignition switches.  A high-level engineer at GM acknowledged that this failure to change the part number was a "cardinal sin."  As the Valukas Report concluded, "while the decision to change the Ignition Switch, without changing the part number, violated GM's policies, GM also failed to have in place an oversight system sufficient to ensure such decisions were reviewed and the correct decisions made."[13]

---

[13] *Id.* at 34.

67.    On March 29, 2007, a group of the Company's employees met with NHTSA representatives and were specifically informed of Ms. Rose's fatal crash. The employees were further informed that the crash involved a 2005 Chevrolet Cobalt, a frontal impact, the airbags did not deploy, and that the car's power mode status was in "accessory" position at the time of the crash.  Following the meeting, a GM investigating engineer was directed to track crashes in which Chevrolet Cobalts were involved in frontal impacts and the airbags did not deploy.  By the end of 2007, the Company received notice of ten such incidents, with data for four of the crashes showing that the ignition was in the "accessory" position.  The Company did not issue a recall for the faulty ignition switches at that time nor was the problem escalated to senior management or the Board.

68.    In 2007, Wisconsin State Trooper, Keith Young, investigated the non-deployment of the airbags and arrived at the correct answer to the problem – the same answer GM engineers would adopt six years later in 2013.  Even though Wisconsin Trooper Keith Young's report had been sitting in GM's own files since 2007, the GM Board was not made aware of it until 2014.

69.    In February 2009, another PRTS was opened and resulted in the top of the key being changed from a "slot" design to a "hole" design, as initially proposed in 2005.  According to the PRTS, "[c]ustomers with substantially weighted key chains/additional keys hanging from ignition key have experienced accidental

ignition shut-off.  Changing from a slot to a hole will significantly reduce downward force and the likelihood of this occurrence."  The key design change was implemented in 2010 Chevrolet Cobalts.  However, a recall for the multiple models of cars using the older, faulty ignition switches was not issued at that time, nor was the matter escalated to senior management or the Board.

70.    At a May 15, 2009 meeting, GM engineers learned that data in the black boxes of Chevrolet Cobalts showed that hundreds of thousands of vehicles had dangerous ignition switch defects.  But still no recall was issued, nor was the matter escalated to senior management or the Board.

**B.    Following Old GM's Bankruptcy, the New GM Board Assumes Control but Fails to Adequately Inform Itself of the Safety Problems Plaguing the Company's Vehicles and Fails to Ensure that a Vehicle Recall and Safety Information System Is in Place, All While Touting GM's Commitment to Safety**

71.    On July 10, 2009, a new GM emerged from bankruptcy and was incorporated after acquiring substantially all of the assets and assuming certain liabilities of Old GM.  Around this time in July 2009, defendants Girsky, Russo, Davis, Marinello, Krebs, Bonderman, Isdell, Stephenson, Akerson, Whitacre, and Laskawy were appointed to the Board.

72.    According to GM's Annual Report for the year ended December 31, 2009, which GM filed with the SEC on Form 10-K on April 7, 2010, "the formation of [GM] comes with a renewed vision to design, build and sell the world's best vehicles.  In order to implement this renewed vision, a majority of our Board of

Directors is comprised of directors that did not serve on Old GM's Board of Directors." Moreover, the Form 10-K states that the Board "recently appointed new executive leadership … which meets more frequently than prior leadership committees, resulting in faster decision making and increased accountability." The Form 10-K also touts GM's commitment to "[i]mproving the quality of [GM] cars and trucks, while increasing customer satisfaction and overall perception of [GM] products."

73.     As detailed herein, however, the "new" GM was no different than Old GM. Indeed, each and every director defendant, during their tenures at times between July 2009 and February 2014, failed to inform him or herself of the safety problems plaguing the Company and failed to even ensure that they would be kept abreast of this information going forward by failing to implement a vehicle recall and safety reporting system, all while blindly touting the Company's purported commitment to safety.

74.     Information highlighting the ignition-switch defect would pile up yet the information would never be escalated to senior management or the Board. For example, in March 2010, Brooke Melton was killed in a crash in her 2005 Chevrolet Cobalt. As with many of the previously reported accidents, the ignition switch in Ms. Melton's car had moved from "run" to "accessory" at the time of her crash, thus causing the engine to shut off while she was driving. Documents

uncovered in the lawsuit filed by her family further revealed that GM issued a technical service bulletin for the 2005 Chevrolet Cobalt dated February 28, 2005, for engine stalling as a result of the key moving in the ignition.[14]   Yet, this information was not escalated to senior management – not even GM's General Legal Counsel.   Nor did the information reach the Board, which then included defendants Girsky, Russo, Davis, Marinello, Krebs, Bonderman, Isdell, Stephenson, Akerson, Whitacre, and Laskawy.

75.     A month after Brooke Melton's death, on April 7, 2010, the Company filed the earlier-mentioned Annual Report on Form 10-K for the period ended December 31, 2009.   The Form 10-K improperly assured the public that GM is "committed to leadership in vehicle design, quality, reliability, telematics and infotainment and *safety*" and improperly touted that the Company was poised to compete in the global automotive marketplace due to the purported safety and reliability of GM's vehicles.   The Form 10-K further incorrectly assured the public

---

[14] For reasons not disclosed by the Company, the issuance of the February 2005 service bulletin was not mentioned in GM's chronology of its recall of the 2005-2007 Chevrolet Cobalts, and the Company has inexplicably failed to count Ms. Melton's death among the thirteen people that GM admits were killed as a result of ignition problems.   The family of Brooke Melton settled last year with GM for $5 million, however the Meltons filed a new complaint in May 2014 alleging that GM fraudulently concealed evidence during the first case.   The judge denied GM's motion to dismiss the Melton's new complaint and set a trial date for April 2016.

that potential defects would be timely reported and the vehicles in question would be recalled if necessary. The Form 10-K stated, in relevant part:

> **Competitive Position**
>
> The global automotive industry is highly competitive. The principal factors that determine consumer vehicle preferences in the markets in which we operate include price, quality, available options, style, safety, reliability, fuel economy and functionality. Market leadership in individual countries in which we compete varies widely.

The Form 10-K also misstated the Company's financial condition by, among other things, understating expenses, overstating income, and understating liabilities because the financial implications of the recalls were not properly accounted for. *See infra* at ¶189.

76.    The April 7, 2010 Form 10-K was approved and signed by defendants Whitacre, Cyprus, Akerson, Bonderman, Davis, Girsky, Isdell, Krebs, Laskawy, Marinello, Russo, and Stephenson.

77.    Yet, as detailed herein, these defendants had absolutely no basis for making these statements in the April 7, 2010 Form 10-K, or any of the other Forms 10-K that they would later approve and sign. The Individual Defendants' fiduciary duties, at a minimum, required them to implement and oversee internal controls to ensure the Board received reports of all vehicle safety defects which were linked to customer deaths especially given that vehicles plagued with the defects were still on the road. In short, while internal controls to inform the Board of critical vehicle

safety and recall issues were entirely absent, and the Individual Defendants promoted a culture where safety issues were swept under the rug, they repeatedly touted their commitment to safety.

78.    Notably, by approving and signing the April 7, 2010 Form 10-K, defendants Whitacre, Cyprus, Akerson, Bonderman, Davis, Girsky, Isdell, Krebs, Laskawy, Marinello, Russo, and Stephenson also acknowledged the requirements of the Safety Act, and that potential defects must be reported and the vehicles in question be recalled if necessary.  Specifically, the Form 10-K states, in relevant part:

> *Safety*
>
> New vehicles and equipment sold in the U.S. are required to meet certain safety standards promulgated by the NHTSA. The National Traffic and Motor Vehicle Safety Act of 1966 authorized the NHTSA to determine these standards and the schedule for implementing them. In addition, ***in the case of a vehicle defect that creates an unreasonable risk to motor vehicle safety or does not comply with a safety standard, the National Traffic and Motor Vehicle Safety Act of 1966 generally requires that the manufacturer notify owners and provide a remedy.***   The Transportation Recall Enhancement, Accountability and Documentation Act requires us to report certain information relating to certain customer complaints, warranty claims, field reports and lawsuits in the U.S. and fatalities and recalls outside the U.S.
>
> We are subject to certain safety standards and recall regulations in the markets outside the U.S. in which we operate. These standards often have the same purpose as the U.S. standards, but may differ in their requirements and test procedures. From time to time, other countries pass regulations which are more stringent than U.S. standards. Most

countries require type approval while the U.S. and Canada require self-certification.

79.    In light of the admitted requirements of the Safety Act, it was all the more necessary that that the Individual Defendants implement and maintain a reporting system to monitor and oversee such matters.   Indeed, the Individual Defendants' utter failure to implement and maintain a vehicle safety and recall reporting information system resulted in GM's failure to abide by its legal obligations under the Safety Act.   This led NHTSA to impose a $35 million fine against the Company – the maximum allowed under the law – years later, after GM's tragic failure to timely recall the ignition switches came to light.

80.    On May 17, 2010, August 16, 2010, and November 10, 2010, the Company filed its Quarterly Reports on Forms 10-Q with the SEC informing investors that a critical component of the reliability of their financial statements was the Company's "ability to maintain quality control over [its] vehicles and avoid material vehicle recalls."   Despite this critical admission, the Individual Defendants then at the Company – including defendants Girsky, Russo, Davis, Marinello, Krebs, Telles, Bonderman, Isdell, Stephenson, Akerson, Whitacre, Laskawy, Ammann, Cyprus, Millikin, and Stevens – failed to implement and oversee a vehicle recall and safety reporting system and senior management and the Board were not informed about safety defects and recalls.   Thus, any assurance that the

Company had the ability to maintain quality control over its vehicles and avoid material vehicle recalls was utterly baseless.

81. Moreover, this public assurance made to investors in the 2010 Forms 10-Q (and later filed Forms 10-Q) further confirms the Individual Defendants' duty to monitor and oversee quality control and vehicle recalls. Because maintenance of quality control over vehicles and avoiding material recalls are admittedly critical to the reliability of the Company's financial statements, it was all the more necessary that that the Individual Defendants implement and maintain a reporting system to monitor and oversee such matters. Indeed, the production of poor quality cars, recalls to fix them, and other consequences like wrongful death or consumer class action litigation can incur substantial costs for the Company in later periods. This is exactly what happened to the Company in the case of the deadly ignition switch. The Individual Defendants' utter and systematic failure to put in place a vehicle recall and safety reporting system allowed the ignition switch defect in the Chevrolet Cobalt and other cars to go unremediated for years. This distorted GM's financial picture by shifting the recall costs to later periods, and exposed the Company to substantial legal liability in an onslaught of various wrongful death, consumer class action, and securities fraud lawsuits.

82. Defendant Cyprus signed each of the Quarterly Reports filed on Forms 10-Q on May 17, 2010, August 16, 2010, and November 10, 2010. Similarly, with

regard to the May 17, 2010 and August 16, 2010 Quarterly Reports, defendant
Whitacre certified pursuant to section 302 of SOX, among other assurances, that:
(i) "the financial statements, and other financial information included in th[ose]
report[s], fairly present in all material respects [GM's] financial condition, results of
operations and cash flows"; and (ii) GM's disclosure controls and procedures were
designed to ensure proper internal reporting of "material information" relating to
GM and to "provide reasonable assurance regarding the reliability of financial
reporting and the preparation of financial statements for external purposes in
accordance with generally accepted accounting principles."  With regard to the
same two Quarterly Reports, defendant Whitacre also certified pursuant to section
906 of SOX that "[t]he information contained in the Report fairly presents, in all
material respects, the financial condition and results of operations of the Company."
Defendant Akerson signed the same SOX certifications for the November 10, 2010
Quarterly Report.

83.    On March 1, 2011, the Company filed its Annual Report on Form 10-
K for the period ended December 31, 2010, with the SEC.  Using substantial similar
language to the April 7, 2010 Form 10-K, the March 1, 2011 Form 10-K again
improperly assured the public that GM is "committed to leadership in vehicle
design, quality, reliability, telematics and infotainment and *safety*," improperly
touted that the Company was poised to compete in the global automotive

marketplace due to the purported safety and reliability of GM's vehicles, and incorrectly assured the public that potential defects would be reported and the vehicles in question would be recalled if necessary. The Form 10-K also misstated the Company's financial condition by, among other things, understating expenses, overstating income, and understating liabilities because the financial implications of the recalls were not properly accounted for.

84.    The March 1, 2011 Form 10-K was approved and signed by defendants Akerson, Cyprus, Bonderman, Davis, Girsky, Isdell, Krebs, Laskawy, Marinello, Russo, Stephenson, and Telles. Yet, as detailed herein, given the ongoing failure of the Individual Defendants then at the Company to implement a vehicle recall and safety reporting information system, these defendants had absolutely no basis for making these statements. In addition, contrary to the situation at the Company and the inaccurate reporting of its financial condition in the March 1, 2011 Form 10-K, defendant Akerson signed certifications for the Annual Report pursuant to sections 302 and 906 of SOX like those for the Quarterly Reports on Forms 10-Q discussed above.

85.    On May 6, 2011, the Company filed its Quarterly Report on Form 10-Q with the SEC again informing investors that a critical component of the reliability of their financial statements was the Company's "ability to maintain quality control over [its] vehicles and avoid material vehicle recalls." Of course,

given the lack of a vehicle recall and safety reporting system, senior management and the Board were not adequately informed about recall and safety matters, including that personnel at the Company had discovered a serious safety defect with ignition switches that affected millions of GM vehicles. Thus, any assurance that the Company had the ability to maintain quality control over its vehicles and avoid material vehicle recalls was baseless. Moreover, this public assurance made to investors further confirms the Individual Defendants' duty to monitor and oversee quality control and vehicle recalls, because it was all the more necessary that that the Individual Defendants implement and maintain a reporting system to monitor and oversee such matters to ensure the reliability of the Company's financial statements. The Form 10-Q also misstated the Company's financial condition by, among other things, understating expenses, overstating income, and understating liabilities because the financial implications of the recalls were not properly accounted for.

86. Defendant Cyprus signed the May 6, 2011 Quarterly Report. Similarly, with regard to the May 6, 2011 Quarterly Report, defendants Akerson and Ammann certified pursuant to section 302 of SOX, among other assurances, that: (i) "the financial statements, and other financial information included in th[at] report, fairly present in all material respects [GM's] financial condition, results of operations and cash flows"; and (ii) GM's disclosure controls and procedures were

designed to ensure proper internal reporting of "material information" relating to GM and to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."   With regard to the same Quarterly Report, defendants Akerson and Ammann also certified pursuant to section 906 of SOX that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

87.   In late July 2011, a meeting was held at GM involving Field Performance Assessment ("FPA"), Product Investigations, and Legal personnel who would be involved in the Field Performance Evaluation ("FPE") process.   Soon thereafter, in August 2011, a Field Performance Assessment Engineer ("FPAE") was assigned to move forward with an FPE investigation of a group of crashes in which airbags in 2005-2007 model year Chevrolet Cobalts and a 2007 Pontiac G5 had not deployed during frontal impacts.

88.   GM's initial investigation of these crashes revealed that many of the ignitions for the vehicles involved in the crashes were recorded as having been in the "accessory" or "off" positions at the time of the crash.   Yet again, the failure of the Individual Defendants then at the Company (including defendants Girsky, Russo, Davis, Marinello, Krebs, Telles, Bonderman, Isdell, Stephenson, Akerson,

Whitacre, Laskawy, Ammann, Cyprus, Millikin, and Stevens) to implement a vehicle recall and safety reporting information system resulted in a "pattern of incompetence and neglect" that failed to raise this serious problem to the highest levels of the Company.[15]  Thus, the Company failed to issue a recall or otherwise inform its customers of the dangers associated with the faulty ignition switches.

89.    On August 5, 2011 and November 9, 2011, the Company filed its Quarterly Reports on Forms 10-Q with the SEC reiterating that a critical component of the reliability of their financial statements was the Company's "ability to maintain quality control over [its] vehicles and avoid material vehicle recalls."  Of course, given the lack of a vehicle recall and safety reporting system, senior management and the Board were not adequately informed about recall and safety matters including that the Company had discovered a serious safety defect with ignition switches that affected millions of GM vehicles.  As such, any assurance that the Company had the ability to maintain quality control over its vehicles and avoid material vehicle recalls was baseless.  Moreover, this public assurance made to investors further confirms the Individual Defendants' duty to monitor and oversee quality control and vehicle recalls, because it was all the more necessary that that

---

[15] GM Press Release, "*GM CEO Mary Barra's Remarks to Employees on Valukas Report Findings*," (June 6, 2014).

the Individual Defendants implement and maintain a reporting system to monitor and oversee such matters to ensure the reliability of the Company's financial statements. The Forms 10-Q also misstated the Company's financial condition by, among other things, understating expenses, overstating income, and understating liabilities because the financial implications of the recalls were not properly accounted for.

90.    Defendant Cyprus signed the August 5, 2011 and November 9, 2011 Quarterly Reports. Similarly, with regard to the August 5, 2011 and November 9, 2011 Quarterly Reports, defendants Akerson and Ammann certified pursuant to section 302 of SOX, among other assurances, that: (i) "the financial statements, and other financial information included in th[ose] report[s], fairly present in all material respects [GM's] financial condition, results of operations and cash flows"; and (ii) GM's disclosure controls and procedures were designed to ensure proper internal reporting of "material information" relating to GM and to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." With regard to the same Quarterly Reports, defendants Akerson and Ammann also certified pursuant to section 906 of SOX that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

91.    On October 3, 2011, defendant Barra – then head of product development – happened to receive an e-mail from Terry J. Woychowski, an engineer with GM.  The e-mail forwarded a news article about a NHTSA probe into steering problems in Saturn Ions.  The article did not reference the Chevrolet Cobalt's ignition switch defect, but raised questions about why GM had not recalled the Saturn Ion, which had the same power steering motor as previously recalled vehicles.  However, demonstrating that she abdicated any duties to monitor, oversee, manage, or otherwise be informed about recalls and safety matters, it appears that defendant Barra did not read or give needed attention to the e-mail or the serious recall matters raised therein.  Consistent with the absence of internal controls regarding vehicle safety and recall matters, defendant Barra claims she did not learn of any issues with the recalled cars until December 2013.

92.    On February 27, 2012, the Company filed its Annual Report on Form 10-K for the period ended December 31, 2011, with the SEC.  Using substantial similar language to the two previous Forms 10-K, the February 27, 2012 Form 10-K again improperly touted that GM is "committed to leadership in vehicle design, quality, reliability, telematics and infotainment and *safety*,"  improperly touted that the Company was poised to compete in the global automotive marketplace due to the purported safety and reliability of GM's vehicles, and incorrectly assured the public that potential defects would be reported and the vehicles in question would

be recalled if necessary.  The Form 10-K also misstated the Company's financial condition by, among other things, understating expenses, overstating income, and understating liabilities because the financial implications of the recalls were not properly accounted for.

93.    The February 27, 2012 Form 10-K was approved and signed by defendants Akerson, Bonderman, Davis, Girsky, Isdell, Krebs, Laskawy, Marinello, Russo, Schoewe, Stephenson, and Telles, as well as officer defendants Ammann and Cyprus.  Yet, as detailed herein, given the above-named Individual Defendants' failure to implement a vehicle recall and safety reporting information system, these defendants had absolutely no basis for making these statements.  In addition, contrary to the situation at the Company and the inaccurate reporting of its financial condition in the February 27, 2012 Form 10-K, defendants Akerson and Ammann signed certifications for the Annual Report pursuant to sections 302 and 906 of SOX like those for the Quarterly Reports on Forms 10-Q discussed above.

94.    In May 2012, the FPAE, who was assigned to study the 2005-2007 model crashes with failed airbag deployments, studied a cross-section of steering columns and ignition switches from Chevrolet Cobalts, Chevrolet HHRs, Pontiac G5s, and Saturn Ions.  The investigation revealed that certain of these ignition switches exhibited torque performance below that specified by GM for the ignition switch.  The investigation further revealed that the most prevalent shortfalls in

performance were observed on ignition switches found in 2007 and earlier model year vehicles. While the investigation *again* confirmed defects with the ignition switches on these vehicles, this serious safety problem was not raised to the highest levels of the Company (including the Board) resulting in the Company's failure to inform its customers or issue a recall.

95.    On May 3, 2012, August 3, 2012, and October 31, 2012, the Company filed its Quarterly Reports on Forms 10-Q with the SEC noting that a critical component of the reliability of their financial statements was the Company's "ability to maintain quality control over [its] vehicles and avoid material vehicle recalls." Of course, given the lack of a proper vehicle recall and safety reporting system, senior management and the Board were not adequately informed about recall and safety matters, including that the Company had discovered a serious safety defect with ignition switches that affected millions of GM vehicles.  Thus, any assurance that the Company had the ability to maintain quality control over its vehicles and avoid material vehicle recalls was baseless.  Moreover, this public assurance made to investors further confirms the Individual Defendants' duty to monitor and oversee quality control and vehicle recalls, because it was all the more necessary that the Individual Defendants implement and maintain a reporting system to monitor and oversee such matters to ensure the reliability of the Company's financial statements. The Forms 10-Q also misstated the Company's financial condition by, among other

things, understating expenses, overstating income, and understating liabilities because the financial implications of the recalls were not properly accounted for.

96.    Defendant Cyprus signed the May 3, 2012, August 3, 2012, and October 31, 2012 Quarterly Reports.  Similarly, with regard to the May 3, 2012, August 3, 2012, and October 31, 2012 Quarterly Reports, defendants Akerson and Ammann certified pursuant to section 302 of SOX, among other assurances, that: (i) "the financial statements, and other financial information included in th[ose] report[s], fairly present in all material respects [GM's] financial condition, results of operations and cash flows"; and (ii) GM's disclosure controls and procedures were designed to ensure proper internal reporting of "material information" relating to GM and to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  With regard to the same Quarterly Reports, defendants Akerson and Ammann also certified pursuant to section 906 of SOX that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

97.    On February 15, 2013, the Company filed its Annual Report on Form 10-K for the period ended December 31, 2012, with the SEC.  Using substantially similar language to the Forms 10-K noted above, the February 15, 2013 Form 10-K

again improperly touted that the GM is "committed to leadership in vehicle design, quality, reliability, telematics and infotainment and *safety*," improperly touted that the Company was poised to compete in the global automotive marketplace due to the purported safety and reliability of GM's vehicles, and incorrectly assured the public that potential defects would be reported and the vehicles in question would be recalled if necessary. The Form 10-K also misstated the Company's financial condition by, among other things, understating expenses, overstating income, and understating liabilities because the financial implications of the recalls were not properly accounted for.

98. The February 15, 2013 Form 10-K was approved and signed by defendants Akerson, Ammann, Cyprus, Bonderman, Davis, Girsky, Isdell, Krebs, Laskawy, Marinello, Mulva, Russo, Schoewe, Solso, Stephenson, and Telles. Yet, as detailed herein, given the above-named Individual Defendants' failure to implement a vehicle recall and safety reporting information system, these defendants had absolutely no basis for making these statements. In addition, contrary to the situation at the Company and the inaccurate reporting of its financial condition in the February 15, 2013 Form 10-K, defendants Akerson and Ammann signed certifications for the Annual Report pursuant to sections 302 and 906 of SOX like those for the Quarterly Reports on Forms 10-Q discussed above.

99.    In late April 2013, the FPAE learned that the torque performance of GM ignition switches purchased after 2010 differed substantially from that of ignitions switches that were originally installed on 2005 Chevrolet Cobalts. Shortly thereafter, GM retained outside engineering resources to conduct a comprehensive ignition switch survey and assessment. Not surprisingly, the lack of a vehicle recall and safety reporting information system prevented this critical information from reaching senior management and the Board. Thus, the Company failed to inform its customers that a defective ignition switch had been again confirmed, that the Company knew which vehicle years were affected, or that the root cause of the defect was being investigated by an outside engineering group. The Individual Defendants' fiduciary duties, at a minimum, required them to implement and maintain internal controls to ensure the Board received reports of all vehicle safety defects linked to customer deaths, especially in light of the fact that vehicles plagued with these defects were still on the road.

100.    On May 2, 2013, July 25, 2013, and October 30, 2013, the Company filed its Quarterly Reports on Forms 10-Q with the SEC reiterating that a critical component of the reliability of their financial statements was the Company's "ability to maintain quality control over [its] vehicles and avoid material vehicle recalls." Of course, given the lack of a vehicle recall and safety reporting system, senior management and the Board were not informed about recall and safety matters,

including that the Company had discovered a serious safety defect with ignition switches that affected millions of GM vehicles. Thus, any assurance that the Company had the ability to maintain quality control over its vehicles and avoid material vehicle recalls was baseless. Moreover, this public assurance made to investors further confirms the Individual Defendants' duty to monitor and oversee quality control and vehicle recalls, because it was all the more necessary that that the Individual Defendants implement and maintain a reporting system to monitor and oversee such matters to ensure the reliability of the Company's financial statements. The Forms 10-Q also misstated the Company's financial condition by, among other things, understating expenses, overstating income, and understating liabilities because the financial implications of the recalls were not properly accounted for.

101. Defendant Timko signed the May 2, 2013, July 25, 2013, and October 30, 2013 Quarterly Reports. Similarly, with regard to the May 2, 2013, July 25, 2013, and October 30, 2013 Quarterly Reports, defendants Akerson and Ammann certified pursuant to section 302 of SOX, among other assurances, that: (i) "the financial statements, and other financial information included in th[ose] report[s], fairly present in all material respects [GM's] financial condition, results of operations and cash flows"; and (ii) GM's disclosure controls and procedures were designed to ensure proper internal reporting of "material information" relating to

GM and to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." With regard to the same Quarterly Reports, defendants Akerson and Ammann also certified pursuant to section 906 of SOX that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

102. On October 29, 2013, GM was provided with supplier records from one of the Company's suppliers showing that changes affecting the torque on the ignition switches had, in fact, been made to the part in 2006. The implemented changes increased the switch's torque performance. The issue was presented to the Field Performance Evaluation Review Committee ("FPERC") and the Executive Field Action Decision Committee ("EFADC"). These two committees reviewed the findings in early December, culminating in an EFADC meeting on December 17, 2013. Although it was clear at the time that the ignition switch torque was inadequate for older models, the EFADC committee did not escalate the problem to senior management and the Board, issue an immediate recall, nor provide notification to its customers. Rather, the members of the EFADC committee deferred the matter for another six weeks to gather yet more information.

103.   Consistent with the Valukas Report's conclusions, "[t]he failures from 2011 to 2013 demonstrate a lack of urgency in the face of a pattern of airbag failures, an unwillingness by GM personnel to re-evaluate their conclusions, a lack of accountability or leadership in driving the investigations to a conclusion, and *a continued reluctance to elevate issues*."[16]

104.   Finally, on January 31, 2014, the EFADC internally directed a safety recall of approximately 778,000 vehicles, including the Chevrolet Cobalt and Pontiac G5 for model years 2005-2007.   The recall was not immediately communicated to the NHTSA or the Company's customers.   For over a decade, there was no demonstrated sense of urgency until after the first recall was notified to the NHTSA on February 7, 2014, and publicly announced on February 13, 2014.[17]

105.   On February 6, 2014, the day before GM would notify the NHTSA of its decision to recall the Chevrolet Cobalts and Pontiac G5s, the Company filed its Annual Report on Form 10-K for the period ended December 31, 2013, with the SEC.   Using substantial similar language to the Forms 10-K noted above, the February 6, 2014 Form 10-K brazenly and improperly continued to assure the

_____

[16] Valukas Report at 211.

[17] *Id.* at 4.

- 69 -

public that GM is "committed to leadership in vehicle design, quality, reliability, telematics and infotainment and *safety*,"  improperly tout that the Company was poised to compete in the global automotive marketplace due to the purported safety and reliability of GM's vehicles, and incorrectly assure the public that potential defects would be reported and the vehicles in question would be recalled if necessary.  The Form 10-K also misstated the Company's financial condition by, among other things, understating expenses, overstating income, and understating liabilities because the financial implications of the recalls were not properly accounted for.  As expected, because the Individual Defendants then at the Company (including defendants Barra, Solso, Bonderman, Davis, Girsky, Isdell, Krebs, Marinello, Millikin, Mullen, Mulva, Russo, Schoewe, Stephenson, Stevens, Telles, Thelen, and Timko) failed to implement a vehicle safety and recall reporting information system to ensure the Board received reports of serious safety defects and recalls,  the Form 10-K did not disclose that a week earlier, the EFADC specifically directed a safety recall for more than three quarters of a million vehicles.

106.  The February 6, 2014 Form 10-K was approved and signed by defendants Barra, Stevens, Timko, Solso, Bonderman, Davis, Girsky, Isdell, Krebs, Marinello, Mullen, Mulva, Russo, Schoewe, Stephenson, and Telles.  Again, given their failure to implement a vehicle recall and safety reporting information system,

these defendants had absolutely no basis for making these statements.  Yet that did not stop defendants Barra and Stevens from also signing certifications for the February 6, 2014 Form 10-K pursuant to sections 302 and 906 of SOX like those for the Quarterly Reports on Forms 10-Q discussed above.

### C. By Design, GM's Internal Processes and Corporate Culture Keep Individual Defendants in the Dark on Safety and Recall Matters

107.   The Individual Defendants, as senior management and/or directors of the Company, had fiduciary duties to oversee and monitor operations concerning safety and recalls and regulatory compliance related thereto.  As a result, they were duty-bound to implement and maintain an information system to inform them of safety and recall matters.  From 2009 to 2014, the Individual Defendants utterly failed to implement such a system.  Instead, they permitted processes and a culture that was directly counter to their oversight and monitoring responsibilities.

108.   Having abdicated their duties to monitor and oversee safety and recall matters, the Individual Defendants paved the way for GM to develop or otherwise maintain internal processes and a corporate culture that: (i) intentionally excluded senior management and the Board from the recall process; (ii) failed to require accountability; (iii) instead discouraged frank communications about safety issues; and (iv) allowed GM personnel – and not just senior management and the Board – to remain compartmentalized and in the dark regarding important safety matters.  A culture of willful ignorance and unaccountability therefore flourished, and the

Individual Defendants – far removed from critical safety and recall information – buried their heads in the sand while washing their hands as to matters concerning safety and recalls.

109.    As *Reuters* explains in a March 29, 2014 article titled "GM Recall Process Will Be under Congressional Microscope,"    "***GM built a system to deliberately keep senior executives out of the recall process***."    Only "two small groups of employees in the vast GM bureaucracy were tasked with making recall decisions," *Reuters* explains.    The first group "would vet incoming data and decide if a recall was warranted, then make a recommendation to an even smaller group in charge of approving the recall.    If the second group approved a recall, the recommendation would then go to senior management."    Critically here, as one can see, senior management would only become involved in the recall process if the second group approved a recall.    Senior management and the Board (e.g., the Individual Defendants) would remain ignorant of decisions declining to recall vehicles, as was long the case for the defective ignition switch in the Chevrolet Cobalt.    Senior management and the Board would also have no visibility on the status of the decision making process to ensure that it proceeded in a timely manner.    Thus, as was also case with the Chevrolet Cobalt, the small groups were enabled to proceed with virtually no oversight and at a snail's pace despite obviously urgent safety issues at hand.

110.    GM purportedly states that this old system was meant to bring objective decisions.  Superficially, this sounds nice.  But this hollow excuse cannot serve as a reasonable basis to intentionally exclude senior management and the Board from the recall process.  The Individual Defendants' fiduciary duties to monitor, oversee, and be informed about such critical operational matters – especially in light of the regulations imposed on GM as a vehicle manufacturer and in light of the False Statement Defendants' public statements concerning safety – forbid them from putting the recall process in a black box.  Such an opaque system could never be the product of valid business judgment.

111.    The Valukas Report provided to GM's Board on May 29, 2014, sheds greater light on the culture within GM that it described as a "proliferation of committees and a lack of accountability."  For example, the Valukas Report tells how a witness described a GM "phenomenon of avoiding responsibility" known as the "'GM salute,'" where a person would cross arms and point outward towards others, indicating that the responsibility belongs to someone else.[18]  The Valukas Report explains that "[i]t is this same cabining of responsibility, the sense that someone else is responsible, that permeated the Cobalt investigation for years."

---

[18] Valukas Report at 255.

112.   In addition to the "GM salute," a second phenomenon known as the "'GM nod'" contributed to and exemplified the culture of unaccountability. According to the Valukas Report, defendant Barra described the "'GM nod'" as being "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[19]   This, the Valukas Report observes, "is an idiomatic recognition of a culture [] that does not move issues forward quickly, as the story of the Cobalt demonstrates."[20]

113.   Given this culture, it is not surprising that the Valukas Report found that "[w]hile the issue of the ignition switch passed through numerous hands at GM, from engineers to investigators to lawyers, ***nobody raised the problem to the highest levels of the company***."[21]

114.   Defendant Barra acknowledged that, "[i]f this information had been disclosed, I believe in my heart the [C]ompany would have dealt with this matter appropriately."[22] But instead the lack of any vehicle safety and recall reporting

---

[19] *Id.* at 256.

[20] *Id.*

[21] *Id.* at 4.

[22] *Id.*

information system promoted "the willingness of others in the [C]ompany to condone bureaucratic processes that avoided accountability," resulting in "nobody rais[ing] the problem to the highest levels of the company."[23]

115.  During a Senate hearing, defendant Millikin, as GM's General Counsel, admitted that he did not know of the ignition-switch defect until February 2014, nor was he aware of litigation involving fatal accidents linked to the defect. [24] As Senator Dean Heller correctly explained, "[e]ven if [defendant Millikin, GM's General Counsel] didn't know, he had an obligation to know."[25]  Defendant Millikin remained in the dark alongside the Board as a result of the Individual Defendants' failure to implement internal controls to ensure senior management and the Board received vital safety and recall information, including reports and litigation updates concerning vehicle safety defects potentially linked to customer deaths.

116.  Not surprisingly, consistent with the Valukas Report's findings, the GM legal department had no reporting system in place to inform senior management, including GM's General Counsel, or the Board, of cases involving

---

[23] *See supra* note 15.

[24] Dale Buss, *Barra Is Protecting GM Top Lawyer Millikin – But Should She Be?*, Forbes (July 20, 2014), http://www.forbes.com/sites/dalebuss/2014/07/20/barra-protects-gm-chief-counsel-millikin-but-should-she-be/.

[25] *Id.*

fatalities or potential safety issues. These matters are discussed in greater detail below. *See infra.* at Section VI.D.

117. The Valukas Report also shows that GM's culture of cost-cutting contributed to GM's failure to resolve the ignition switch issue earlier.[26] For example, in October 2012, the engineer responsible for implementing the ignition switch sent an e-mail to an investigator with GM's Product Investigations Unit stating: "If we replaced switches on ALL the model years, i.e., 2005, 2006, 2007 the piece price would be about $10.00 per switch." Although GM considered implementing a recall to fix the defective ignition switches, GM declined to do so. Consistent with GM's pattern and practice, this information was not reported up the chain to senior management or the Board.

118. In a manner seemingly ripped from a Hollywood script or a John Grisham novel, GM specifically trained its employees to avoid producing records or communications that could later be used against the Company in litigation, thereby hindering frank communications and the reporting of material information. For example, GM trained its employees to avoid the words "defect," "problem," "failed," "flawed," "critical," "unstable," "safety related," "bad," "life-threatening,"

---

[26] Valukas Report at 251.

"serious," or other words suggesting that any GM-branded vehicles are defective.[27]
GM employees received examples of sentences that they were not to use, including
"Dangerous … almost caused accident" and "This is a safety and security
issue…."[28]   Real life examples were also provided to employees to illustrate how
frank discussions of safety issues could be used against the Company in litigation.[29]

119.   In addition to being coached on how to write, GM employees reported
that they did not take notes at critical safety meetings because they believed GM
lawyers did not want such notes taken.[30]   The Valukas Report states that "for many
meetings – of GM's many committees – there are no clear records of attendance or
of what was discussed or decided."[31]

120.   On April 1, 2014, defendant Barra acknowledged this cost-cutting
culture, stating that GM had finally "moved from a cost culture to a customer
culture."[32]

---

[27] *Id.* at 254.

[28] *Id.* at 254.

[29] *Id.*

[30] *Id.*

[31] *Id*. at 255.

[32] Jeff Plungis, et al., *GM's Barra Short on Answers as Congress Probes Recall
Delay*, Bloomberg (Apr. 1, 2014).

121.   The Valukas Report also found that a silo mentality plagued GM's corporate culture, with "serious consequences" for the Company.[33]   GM personnel, over a decade, "failed to search for, share or gather knowledge."[34]   Showing the systematic nature of these failures, the Valukas Report explains: "There are multiple components to these failures, involving individual mistakes, organizational dysfunction, and systems inaccessible to some and impenetrable to many."[35]   For example, from 2007 forward, GM employees failed to find readily available – even publicly available – materials, including studies posted on the NHTSA website and GM's own technical service bulletins, which were available both publicly and internally.[36]   As another example, the Valukas Report notes that, starting in 2011, "the fact that the Cobalt accidents led to fatalities was not shared with all relevant decision-makers."[37]

---

[33] Valukas Report at 256.

[34] *Id*.

[35] *Id*.

[36] *Id*.

[37] *Id*.

**D.    Lack of Reporting System in GM's Legal Department Prevents Individual Defendants from Receiving Information Regarding Nature of the Ignition Switch Defect and Related Fatalities**

122.    The findings in the Valukas Report, among other revelations, demonstrate that the Individual Defendants failed to implement and maintain a reporting system in the GM legal department to ensure that senior management, including GM's General Counsel (defendant Millikin), or the Board, were informed of cases involving fatalities or potential safety issues.  This further contributed to the Individual Defendants' tragic failure to ensure the timely detection and correction of the deadly ignition switch defect.

123.    Starting in at least 2006, the GM legal department was inundated with matters involving fatalities linked to the non-deployment of airbags and the ignition switch issue, yet escalation to GM's General Counsel (at the time defendant Millikin) or the Board never occurred.  These matters include, but are not limited to, the following:

- A January 31, 2006 matter presented to the Roundtable[38] in which a driver who lost control of her 2005 Chevrolet Cobalt crashed her car,

--------

[38] Litigation settlements of between $100,000 and $1.5 million (a limit which was eventually increased to $2 million) required approval by a committee known as the "Roundtable."  The Roundtable Committee met weekly, was led by the GM Litigation Practice Area Manager, and all product litigation staff attorneys were invited to attend.

and died en route to the hospital.  The airbags did not deploy and the vehicle's power mode status at the time of the crash was in the Accessory position.  The case settled.[39]

- GM's legal department received a written briefing about another non-deployment case on September 7, 2006 in which an airbag did not deploy.[40]

- On September 25, 2006, a law firm submitted a case evaluation to GM related to a July 4, 2004 crash in which an airbag did not deploy.  The law firm identified the crash as one in which there should have been an airbag deployment, and that the deployment likely would have saved the victim's life.  On October 3, 2006, a Roundtable reviewed the matter and granted settlement authority.[41]

- On November 15, 2006, a television reporter contacted GM's legal department regarding an October 2006 crash.  The airbags did not deploy and there were two fatalities.[42]

_____

[39] Valukas Report at 110-11.

[40] *Id*. at 111.

[41] *Id*. at 112-13.

[42] *Id*. at 113-14.

- In February 2007, GM's legal department received an accident report by Wisconsin State Trooper Keith Young which clearly stated that the movement of the ignition switch from the Run into Accessory may have caused the airbag non-deployment in the October 2006 crash.[43]

- At least by 2012, a report by Indiana University, which reached the same conclusion as the Wisconsin State Trooper report, came to the attention of the GM legal department when a plaintiff's expert brought it to their attention.[44]

124.   Even repeated warnings from GM's outside legal counsel were not escalated to senior management or the Board.  For example, in October 2010, GM's legal department received a case evaluation, prepared by its outside legal counsel, regarding a December 31, 2009 Chevrolet Cobalt crash.   The case evaluation warned GM that it was at risk of being subjected to punitive damages based on the non-deployment of airbags.[45]  Specifically, the case evaluation noted that a "sensing anomaly" may have prevented the deployment.  GM's outside legal counsel updated

---

[43] Although the report was in GM's legal department files as of February 2007, GM lawyers and engineers working on airbag non-deployment cases did not learn of its existence until 2014.  *Id*. at 115.

[44] *Id*. at 115.

[45] *Id*. at 140.

its case evaluation on November 2, 2010, and continued to warn of the likelihood of a "significant" plaintiffs' verdict under "these unusual circumstances" because "an apparent malfunction … prevented airbag deployment…."[46]  Although the case was discussed within GM's legal department, it was not reported to GM's General Counsel (at the time defendant Millikin) or the Board as no formal reporting system was in place to require such action.

125.  In July 2011, GM's outside legal counsel again warned GM's legal department about the risk for punitive damages in connection with a February 2011 accident in which a Chevrolet Cobalt's airbags did not deploy.  The case evaluation again highlighted the "sensing anomaly" about which it had twice before written, noting that jurors would expect the airbags to deploy in this case and even GM's own expert could not rule out the "sensing anomaly" as the cause.[47]  Although this matter was discussed within GM's legal department, it was also not reported to GM's General Counsel (at the time defendant Millikin) or the Board as no formal reporting system was in place to require such action.

126.  In February 2012, GM's outside legal counsel submitted a case evaluation in connection with a March 2010 accident in which the airbags did not

---

[46] *Id*. at 141-42.

[47] *Id*. at 148-49.

deploy.  GM's outside legal counsel noted that GM had seen this phenomenon before: "FPA engineers have seen instances in 2006-07 model year Cobalts where rough road conditions cause 'bounce' in the ignition switch."[48]  Although this matter was discussed within GM's legal department, it was also not reported to GM's General Counsel (at the time defendant Millikin) or the Board as no formal reporting system was in place to require such action.

127.   Once again, on April 18, 2012, GM's outside legal counsel submitted a case evaluation to GM's legal department warning it that prior non-deployment events in 2005 and 2007 Chevrolet Cobalts "had resulted in deaths," putting GM "at risk" for a punitive damage award.[49]  The case evaluation drew a link between the airbag non-deployment and the vehicle's power mode status of Accessory and also explained that there were other incidences of Chevrolet Cobalt airbag non-deployment in which the "system was not in Run Mode at the time of impact."[50]  Although this matter was discussed within GM's legal department, it was also not reported to GM's General Counsel (at the time defendant Millikin) or the Board as no formal reporting system was in place to require such action.

---

[48] *Id*. at 163.

[49] *Id*. at 169.

[50] *Id*. at 167-69.

128.   In June 2012, a plaintiff's expert, Erin Shipp, issued her report, which was provided to GM's legal department during the course of litigation.  Notably, Ms. Shipp concluded that "General Motors' improper design resulted in a vehicle that was defective in a manner that caused the airbag to not deploy in a crash that General Motors has determined should have had an airbag deployment."[51]    Ms. Shipp's "report made clear that an expert, with limited access to GM information, had made the connection between the Ignition Switch and airbag non-deployment before GM personnel."[52]  GM's outside legal counsel advised that "if the case is tried, GM will lose and that, although the demand is high, as time goes, and the Cobalt investigation remains unresolved, the verdict exposure will increase and the defense of the case will become more complicated."[53]  Yet, despite discussion within GM's legal department, this matter was not reported to GM's General Counsel (at the time defendant Millikin) nor to the Board.

129.   Worse, during discussions of the above matter, a new in-house attorney hired in April 2012, asked why GM had not issued a recall only to be told that engineering simply did not know how to fix the problem.  According to the new in-

---

[51] *Id*. at 182.

[52] *Id*.

[53] *Id*. at 183.

house attorney, he "got the sense from the other lawyers that they had done 'everything we could do.'"[54]  It seems he received the GM salute.

130.  On October 31, 2012, GM's outside legal counsel submitted a case evaluation regarding another accident and again explained the link between the ignition switch defect and the non-deployment of airbags.[55]  The matter was again discussed within the GM legal department but was not raised to senior management or the Board.

131.  In April 2013, GM's legal department was yet again informed of the link between the ignition switch and the non-deployment of airbags.  Specifically, GM received a report from plaintiff's expert in the Brooke Melton case expressly stating that the ignition switch had been changed in 2006.[56]  Around the same time, during the deposition of DeGiorgio, the GM engineer who changed the ignition switch in 2006 (without changing the part number), "plaintiff's counsel dropped a 'bombshell,' namely evidence that the switch had, indeed, been changed from 2005 to 2008 – evidence that had eluded GM engineers for years and that DeGiorgio

---

[54] *Id*. at 184.

[55] *Id*. at 190.

[56] *Id*. at 194.

testified, under oath, that he did not remember."[57]  Yet, this information was never escalated to senior management or the Board.  Worse, rather than initiating the recall process or even escalating the matter, the reporting systems in place at the time allowed GM to delay even further, in spite of the number of fatal accidents already linked to the defect.  Indeed, GM hired an expert to reconfirm what it had already repeatedly learned.[58]  It took six months *after* the deposition for the GM expert to confirm what GM was repeatedly told: the ignition switch had changed.

132.  In July 2013, GM's outside legal counsel "warned of a 'compelling[]' case that GM had known about the defect since 2005 'and essentially has done nothing to correct the problem for the last nine years.'  Still, no GM lawyer apprised the General Counsel" – who was at the time defendant Millikin.  The GM supplier which built the ignition switch was not even contacted until October.[59]  Again, this information was not escalated to senior management or the Board.

133.  In November 2013, even when the GM expert confirmed that the ignition switch was defective and had been changed in 2006 (the same conclusion that the Wisconsin State Trooper and Indiana University reports had come to) GM

---

[57] *Id*. at 199.

[58] *Id*. at 194.

[59] *Id*. at 213.

simply referred the matter to committees versus immediately escalating the matter to senior management and the Board.[60]  It would not be until January 31, 2014, that the recall was ordered.

134.  During a Senate hearing, defendant Millikin (as GM's General Counsel) admitted that he did not know of the ignition-switch defect until February 2014, nor was he aware of litigation involving fatal accidents linked to the defect. This admission is consistent with the legal department's lack of a reporting system to inform senior management, including GM's General Counsel, or the Board, of cases involving fatalities or potential safety issues.  As Senator Dean Heller correctly explained, "[e]ven if [defendant Millikin, GM's General Counsel,] didn't know, he had an obligation to know."  Yet defendant Millikin remained in the dark alongside the Board as a result of the Individual Defendants' failure to implement internal controls to ensure senior management and the Board received vital safety and recall information, including reports and litigation updates concerning vehicle safety defects potentially linked to customer deaths.

### E.   Changes Made to the Finance and Risk Committee Charter and Failure to Comply with the Charter Reflect a Corporate Structure Designed to Keep Senior Management and the Board in the Dark

135.  In August 2012, the Board made changes to the Finance and Risk

---

[60] *Id.*

Committee consistent with designing a corporate structure to keep senior management and the Board in the dark.

136.   Specifically, the Board removed purported responsibility over risk management from the Finance and Risk Committee and renamed it the Finance Committee.

137.   According to GM's April 25, 2013 Proxy Statement on Form DEF 14A filed with the SEC, the risk management responsibilities were purportedly "assumed" by the Audit Committee:

> In August 2012, the Board approved amendments to the charter of the Finance and Risk Committee, and the Committee was renamed the Finance Committee.  The Finance Committee is responsible for assisting the Board in its oversight of our financial policies and strategies, including our capital structure.  In addition, the Finance Committee periodically receives reports regarding our U.S. employee benefit plans for the purpose of reviewing the administration, financing, investment performance, risk and liability profile, and funding of such plans, in each case including with respect to regulatory compliance.  Before the amendments to the charter, the Finance and Risk Committee had responsibility for assisting the Board in its oversight of our risk management strategies and policies, including overseeing management of market, credit, liquidity, and funding risks.  These responsibilities have been assumed by the Audit Committee.

138.   Yet many of the risk management responsibilities were simply deleted from the from Finance and Risk Committee's Charter without any analogue being present or added to the Audit Committee's Charter.  Indeed, the Audit Committee's Charter has not been amended since November 15, 2011.  Specific responsibilities

of the former Finance and Risk Committee that have not been specifically tasked to the Audit Committee in its Charter include:

- "Review with management the categories of risk the Company faces, including risk concentrations and risk interrelationships, as well as the likelihood of occurrence, the potential impact of those risks and mitigating measures";

- "Review with management the design of the Company's any risk management functions, including reporting lines of authority, communications, and control functions, to assess whether they are appropriate given the Company's size and scope of operations";

- "Review internal systems of formal and informal communication across business units and control functions to encourage the prompt and coherent flow of risk-related information and, as needed, escalation of information to management (and to the Committee and the Board as appropriate)"; and

- "Coordinate with the Chair of the Executive Compensation Committee to ensure that GM's compensation arrangements are designed to provide incentives that are consistent with the interests of GM's stockholders but do not encourage senior executives to take excessive risks that threaten the value of the Company."

139.  Granted, the above risk responsibilities did not specifically identify recalls, fatalities, quality control, or similar issues relating to safety that would have helped the Board in detecting the deadly ignition switch defect plaguing GM vehicles.  The risk responsibilities were no supplement for the necessary safety and recall reporting and information system that the Individual Defendants failed to implement and maintain.  Nonetheless, the August 2012 changes to the former Finance and Risk Committee and incomplete transfer of responsibilities to the Audit Committee marked a further step backwards for the Board, then comprised of defendants Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Bonderman, Isdell, Stephenson, Akerson, and Laskawy and was consistent with designing a system that kept senior management and the Board in the dark.

140.  Moreover, it is quite clear defendants who once served on the former Finance and Risk Committee during relevant times – Akerson, Bonderman, Davis, Girsky, Krebs, Laskawy, Russo, and Schoewe – did not fulfil their Charter-imposed responsibilities, including to "encourage the prompt and coherent flow of risk-related information" and encourage necessary "escalation of information" to senior management and the Board.  As detailed herein, although safety and recall issues admittedly posed a significant risk to the Company and the integrity of its financial statements, among other risks, the Board never put in place an information and reporting system to ensure that material information was escalated to senior

management or the Board.  Processes were designed to keep senior management and the Board in the dark.  A corporate culture persisted that discouraged frankness, avoided accountability, deferred critical decisions, and fostered a silo mentality. Critical information pouring in from litigation against the Company, including regarding fatalities and the nature of the ignition switch defect, did not reach defendant Millikin, the Company's General Counsel, let alone the rest of senior management or the Board.

141.   The following defendants served on the Finance and Risk Committee during relevant times: Akerson, as the chair during at least 2010; Bonderman, from at least 2011 to 2012; Davis, during at least 2010; Girsky, from 2010 to 2012; Krebs, as the chair, from at least 2011 to 2012; Laskawy, from 2010 to 2012; Russo, from 2010 to 2012; and Schoewe, during at least 2012.  These defendants miserably failed to fulfill their specific risk oversight responsibilities, in addition to their basic fiduciary duties requiring them to put in place an adequate reporting and information system.

142.   To the extent that defendants might argue that the Audit Committee somehow did "assume" all the responsibilities of the Finance and Risk Committee, then the defendants on the Audit Committee during relevant times similarly failed to fulfil their specific risk oversight responsibilities, including to "encourage the prompt and coherent flow of risk-related information" and necessary "escalation of

information" to senior management and the Board.  The following defendants served on the Audit Committee during relevant times: Davis, from at least 2010-2014; Krebs, from at least 2010-2014; Marinello, from at least 2010-2104; and Solso, from at least 2013-2014.

143.  Demonstrating the failure of the Audit Committee to "assume" the responsibilities of the former Finance and Risk Committee, the Board has recently backtracked on its purported transfer of duties.  On June 10, 2014, the Board approved an amendment to its bylaws to add a new section creating the Operating Risk Committee.  This new committee will be responsible "for assisting the board of directors in its oversight with respect to management's identification, evaluation and management of the Company's major operating risk exposures and the Company's policies and procedures for *ensuring vehicle safety*."[61]  Notably, none of the Board's committee charters before this time specifically assigned responsibility for vehicle safety oversight.  Yet even now, these changes seem woefully inadequate, as no committee seems to have a clear directive to oversee and monitor the Company's recalls of vehicles.

_____

[61] GM Amended and Restated Bylaws (June 10, 2014); GM Form 8-K (June 10, 2014).

###### F.    The Truth Slowly Emerges

144.    On Friday, February 7, 2014, the Company notified the NHTSA of its decision to recall the 2005-2007 Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The recall was not announced to the public until a week later on February 13, 2014.

145.    On February 24, 2014, GM expanded the safety recall to include the Chevrolet HHR and Pontiac Solstice for model years 2006-2007, Saturn Ion for model years 2003-2007, and the Saturn Sky for model year 2007.  The expansion brought the initial recall total to more than 1.65 million vehicles.

146.    Also on February 24, 2014, the Company submitted a chronology to NHTSA detailing much of the facts above.  The chronology acknowledged that certain GM employees were aware of the ignition switch problem by at least 2004.

147.    On March 11, 2014, the Company sent an updated chronology to NHTSA.  The updated chronology suggested that GM had discovered the defects in its ignition switch as far back as 2001.

148.    The same day, reports surfaced that the DOJ had begun a criminal investigation into GM's decade-long failure to address deadly safety problems in the Company's vehicles.  The preliminary inquiry by federal prosecutors in New York focused on whether GM failed to comply with laws requiring timely disclosure of vehicle defects.

149.    The revelations in the chronology and the report of the DOJ investigation drove GM shares down $1.91, to close on March 11, 2014 at $35.18 per share.  This marked a single-day decline of 5%.

150.    On March 17, 2014, GM issued a press release announcing that "GM [r]edoubles [s]afety [e]fforts," and reported further recalls of vehicles including over 1.5 million additional vehicles not previously recalled.  The Company also announced a $300 million charge in the first quarter of 2014 in order to deal with the recall campaigns.

151.    On March 22, 2014, reports surfaced that the DOJ had begun investigating whether GM hid the ignition switch defect when the Company filed for bankruptcy in 2009.  The DOJ investigation also included a probe of whether GM committed bankruptcy fraud by not disclosing the ignition problem. Authorities are also investigating whether GM understated the defect to federal safety regulators.

152.    The U.S. House of Representatives is also investigating GM's decade of failures.  On April 1, 2014, the House of Representatives Committee on Energy and Commerce released a memorandum noting that the chronology of events that GM submitted to the NHTSA grossly understated the amount of information regarding the faulty ignition switch that was brought to the Company's attention over the past decade.  According to the memorandum, from June 2003 to June

2012, at least 133 customers "rais[ed] concerns directly to GM dealers about vehicles that were unexpectedly stalling or turning off when going over bumps or when the key was bumped." The memorandum further noted that:

> *In many of these warranty claims, the comments from consumers and GM technicians indicate that they had identified the ignition switch as the likely cause of the problem.* Yet at the same time that GM was receiving these consumer complaints, the company continued to deny any defect. *To this day, GM has not reported the vast majority of these incidents to National Highway Traffic Safety Administration (NHTSA) or revealed them to the public.*

153. The Company has admitted that at least thirteen deaths have been linked to the defective ignition switch. Federal crash data shows that the death toll may be much greater, with over three hundred deaths linked to airbags that failed to deploy on just two of the models that were recalled by the Company. These deaths could have been easily prevented. Indeed, the Company has revealed that the ignition switch can be "swapped out" in a matter of minutes by GM mechanics for a cost of approximately $10 per vehicle. To date, over six million vehicles recalled are related to faulty ignition switch issues.

154. On April 1, 2014, *Reuters* published an article by Lucy P. Marcus titled "How GM Can Recover" confirming that recalls were handled – purposefully – in a manner to keep senior management in the dark. Ms. Marcus states, in relevant part:

> The [GM] board must also make sure there will not be another situation where executives make a decision under the guise of

protecting the company, but in the end puts GM in an untenable position, like the one it's now in. In the case of the faulty switch, *GM chose to create two small and isolated committees to handle recall cases, fashioned in such a way that senior executives were purposely kept in the dark. Board members have an obligation to challenge senior management's thinking on these types of decisions and structures,* which seem to make sense within in [sic] a bureaucracy, but in reality put the company at risk.

She adds: "GM's board, like every board, has a multifaceted role as *watchdog*, *ethical center* and independent thinker."  According to her website bio, Ms. Marcus is the founder and CEO of Marcus Venture Consulting, and serves as a non-executive board director and member of the Control, Risk and Corporate Governance Committee of global infrastructure company Atlantia SpA, non-executive chair of the Mobius Life Sciences Fund, chair of the Mobius Life Sciences Fund Investment Panel, and she is a non-executive director and chair of the board's audit committee of BioCity Nottingham.

155.  On April 8, 2014, the NHTSA disclosed that it was fining GM $28,000 for not providing information requested as part of an investigation into the ignition switch recall.  The NHTSA sent a letter to GM on March 4, 2014, warning that the agency would fine the Company $7,000 a day until it provided better answers, which were due April 3, 2014.  Specifically, GM failed to respond to 107 questions from the NHTSA about events that led up to the ignition switch recall.  The agency also threatened to send the case to the DOJ if GM failed to respond.  The $7,000 a day fine represents the maximum such penalty the NHTSA can impose.

156.  On April 10, 2014, GM confirmed that it placed two engineers on leave following a briefing by former U.S. Attorney Valukas, who was retained by GM to conduct an investigation into the ignition defect recall.

157.  On this news, GM's stock dropped $0.32 per share, or 1%, closing at $33.30 on April 10, 2014.

158.  On April 11, 2014, the House of Representatives Committee on Energy and Commerce released 700 pages of internal GM documents that it gathered as part of its investigation into why it took GM more than a decade to act on the deadly ignition switch defect.

159.  Investors did not react favorably to the revelations in these documents. That day, April 11, 2014, GM's stock price plunged a $1.37 per share, or 4%, to close at $31.93.  This also amounted to an overall share decrease of $4.18 per share, or nearly 12%, since the Company's stock closed at $36.11 per share on February 7, 2014.

160.  On May 16, 2014, GM entered into a Consent Order with NHTSA in which it admitted that it violated the Safety Act by not disclosing the ignition switch defect, and agreed to pay $35 million, the maximum available civil penalties for its violations.

161.  On May 29, 2014, Valukas submitted the Valukas Report to the GM Board.  The Valukas Report details Valukas' findings following his lengthy

investigation into the circumstances that led up to the recall of the Chevrolet Cobalt and other vehicles due to the flawed ignition switch.    The Valukas Report concluded, among other things, that:

- The ignition switch issue was touched by numerous parties at GM – engineers, investigators, lawyers – but nobody raised the problem to the highest levels of the Company;

- While everybody who was engaged on the ignition switch issue had the responsibility to fix it, nobody took responsibility;

- When the issue was flagged, it ultimately died in a committee or with some other ad hoc group exploring the issue;

- Determining the identity of any actual decision-maker was impenetrable;

- GM culture and the response of supervisors may have discouraged individuals from raising safety concerns; and

- In many instances, GM personnel were not aware of a relevant policy to govern their decisions or did not sufficiently understand an existing policy, and many employees reported receiving little to no training on policies and substantive issues relevant to their roles.

162.   Moreover, the Valukas Report indicates that GM's culture of cost-cutting, discussed *supra* at ¶¶116-19, contributed to GM's failure to resolve the ignition switch issue earlier.[62]

163.   The Valukas Report also issued a number of recommendations aimed at building an appropriate internal control environment.  In particular, the Valukas Report recommended that the Company "[e]ducate employees that ***shielding senior executives or other employees from information in order to allow them to deny knowledge is not acceptable***; on the contrary, employees should err on the side of elevating potential safety issues."[63]

164.   Tellingly, defendant Barra did not deny the findings in the Valukas Report.  Instead, she acknowledged that the Valukas Report uncovered "a pattern of incompetence and neglect," and proclaimed that the Company has since "restructured the safety decision-making process to raise it to the highest levels of the [C]ompany."   In other words, no internal reporting information system regarding vehicle safety and recalls previously existed.  Indeed, Mark Reuss, an executive vice president at GM admitted that these new changes "could have really

---

[62] Valukas Report at 251.

[63] *Id*. at 273.

helped us prevent this in the past."[64]

165.   Around the time the Valukas Report came out, GM announced that it was turning to Kenneth Feinberg – the attorney famous for running the compensation fund for victims of the September 11, 2001 terrorist attacks and a different fund for the victims of the April 2010 oil spill in the Gulf of Mexico – to help GM set up a fund to compensate victims of accidents caused by faulty ignition switches.  Mr. Feinberg began taking claims for the GM victim's fund beginning on August 1, 2014 and expected to take claims until the end of the year.  *Reuters* reported on August 8, 2014 (or little more than a week after beginning to take claims), that Mr. Feinberg stated he had received claims for cases involving ***sixty-three deaths***.  This represents nearly five times the thirteen deaths that GM has attributed to the defective switches.  GM set aside $400 million to fund victims' claims.  But this amount could grow because there is no limit on the fund.

166.   As a result of the Individual Defendants breaches of fiduciary duties, the Company is facing an onslaught of litigation.  As of June 2014, GM was facing over eighty-five federal cases filed in thirty-one district courts on behalf of certain classes or individuals for economic damages arising from the faulty ignition

---

[64] Gregory Wallace, *GM New Changes Could Have Prevented Deadly Recall Crisis*, CNNMoney (Apr. 22, 2014), http.//money.cnn.com/2014/22/autos/general-motors-reorganization/index.html.

switches.  These consumer cases have been consolidated by the U.S. Judicial Panel on Multidistrict Litigation under the caption *In re: General Motors LLC Ignition Switch Litigation*, and have been overseen by U.S. District Judge Jesse M. Furman of the U.S. District Court for Southern District of New York.

167.   GM also has faced a daunting number of wrongful death and personal injury cases, at least some of which appear bound for trial unless GM agrees to settlement for substantial amounts.  For example, although the family of Brooke Melton settled in 2013 with GM for $5 million, the Meltons filed a new complaint in May 2014 alleging that GM fraudulently concealed evidence during the first case.  The judge denied GM's motion to dismiss the Melton's new complaint and set the case for trial in April 2016.

168.   The False Statement Defendants' improper public statements have given rise to a federal securities fraud class action lawsuit pending before this Court against GM, defendants Barra and Akerson, and others at the Company.

169.   In addition to these cases, Tony Rackauckas, the District Attorney for Orange County, California, began pursuing a law enforcement action against GM, which he filed on June 27, 2014.  He alleged that the Company endangered the public through deception regarding vehicle safety and reliability and gained advantage over its competitors by engaging in unfair business practices.  The Orange County District Attorney alleged that GM concealed at least thirty-five

serious defects in over seventeen million GM-branded vehicles sold in the United States. He further alleged that "[t]he systematic concealment of known defects was deliberate, as GM followed a consistent pattern of endless 'investigation' and delay each time it became aware of a given defect." Consistent with the allegations herein, he added, "[i]n fact, recently revealed documents show that GM valued cost-cutting over safety, trained its personnel to *never* use the words 'defect,' 'stall,' or other words suggesting that any GM-branded vehicles are defective, routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues."

170. GM's stock price continued to be depressed due to the Individual Defendants' misconduct. On August 20, 2014, GM's stock closed at $34.53 per share, which is $1.58 below the $36.11 per share price on February 7, 2014, representing a sustained overall decline in stock price of nearly 4.4% since then.

171. The Individual Defendants' failure to implement and maintain a vehicle recall and safety reporting information system sufficient to ensure the Board was kept informed all while blindly promoting GM's commitment to safety is inexcusable and a breach of their fiduciary duties. As defendant Barra admitted, "[s]omething went very wrong in our processes in this instance, and terrible things happened."

### G.    GM's Lack of a Vehicle Recall and Safety Information Reporting System Results in Maximum Penalty for Violating the Safety Act

172.    Congress enacted the Safety Act, 49 U.S.C. §30101, *et seq.*, in 1966, and amended it in 2000 with the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. §§30101-30170, to "reduce traffic accidents and deaths and injuries [to persons] resulting from traffic accidents." To achieve this goal, the Safety Act requires that manufacturers notify owners of vehicles and provide a remedy for any vehicle defect that creates an unreasonable risk to motor vehicle safety or noncompliance with a safety standard. Automakers are also required to promptly report safety defects to the NHTSA within five days of discovering them.

173.    On May 16, 2014, GM entered into a Consent Order with NHTSA in which it admitted that it violated the Safety Act by not disclosing the ignition switch defect, and agreed to pay $35 million, the maximum available civil penalties for its violations.

174.    In addition to the fine, GM agreed, as part of the Consent Order, to comply with a list of tasks on a monthly basis. These tasks range from submitting a written list of every vehicle-safety issue under consideration to monthly meetings with the NHTSA for a year. The Company also agreed to quarterly meetings to discuss the implementation of the requirements of the agreement. The newly established Vice President of Global Vehicle Safety and other named executives

must be present at each of these meetings unless there are "compelling circumstances."  Furthermore, GM agreed to improve its analytics to better identify safety issues in order to establish a way for employees to quickly report concerns.

175.  The Individual Defendants' utter failure to implement and maintain a vehicle safety and recall reporting information system resulted in GM's failure to abide by its legal obligations under the Safety Act.  Had the Individual Defendants satisfied their duties and maintained a proper information system, the ignition switch defect would have been properly handled internally by the Company and timely disclosed to the NHTSA.  Thus, GM would have avoided the $35 million fine and the costs of complying with the Consent Order (including lost time of Company executives).  Because they failed to implement, monitor, and oversee the requisite vehicle safety and recall reporting information system, resulting in costly violations of the Safety Act, the Individual Defendants breached their fiduciary duties.

### H.    Overdue Safety Initiatives Reflect the Long Standing Absence of Internal Controls over Vehicle Safety and Recalls

176.  New safety controls and initiatives announced by GM and recent governance changes further evidence the total lack of an information and reporting system to provide senior management and the Board with safety and recall information.  Only after their misconduct was tied to several deaths, injuries, and millions of defective vehicles have defendants Barra, Solso, Girsky, Russo,

Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, and Isdell finally attempted to fulfill their fiduciary duty to the Company.

177. The new changes, which build the type of internal control and reporting system that GM's fiduciaries were legally required to implement from the start, include the following:

- Created the position of Vice President of Global Vehicle Safety with the global responsibility for safety development of GM vehicle systems, confirmation and validation of safety performance, and post-sale safety activities, including recalls;

- Added thirty-five product safety investigators that will allow the Company to identify and address issues much more quickly;

- Instituted the Speak Up for Safety program, encouraging employees to report potential safety issues quickly and forcefully and recognizing them for doing so;

- Created a new Global Product Integrity organization within Global Product Development that will enhance overall safety and quality performance;

- ***Restructured the recall decision making process to raise it to the highest levels of the Company.  Senior management is now going to be at the center of these issues***;

- 105 -

- Broadened the global engineering requirement of Design for Six Sigma (DFSS) certification to help the Company better understand customer needs and focus efforts on the root causes of customer issues and how to resolve those issues;

- Committed to executing the ignition recall safely and effectively, which includes getting the parts to fix the vehicle; and

- Launched an ignition recall update website and a Spanish-language version in an effort to keep customers updated on the recall and help them better understand what steps they should take if their vehicle is affected.

178. Also demonstrating the lack of internal controls to oversee and monitor safety and recalls, the Board did not, until recently, specifically delegate oversight of vehicle safety to a specific Board committee. On June 10, 2014, the Board approved an amendment to its bylaws to add a new section creating the Operating Risk Committee. This new committee will be responsible "for assisting the board of directors in its oversight with respect to management's identification, evaluation and management of the Company's major operating risk exposures and the Company's policies and procedures for *ensuring vehicle safety*."[65] Notably, none

---

[65] *See supra* note 61.

of the Board's committee charters before this time specifically assigned responsibility for vehicle safety oversight. Yet even now, these changes seem woefully inadequate, as no committee seems to have a clear directive to oversee and monitor the Company's recalls of vehicles.

179. On June 6, 2014, speaking on the findings of the Valukas Report concerning the ignition switch disaster, defendant Barra assured GM employees that GM has acted to "restructure the internal systems that allowed this problem to develop in the first place."[66] As Mark Reuss, an Executive Vice President with GM admitted, the new safety initiatives "*could have really helped us prevent this in the past*."[67]

180. These belated actions confirm the sustained and systematic failure of the Individual Defendants to fulfill their fiduciary duties to the Company and implement an internal reporting information system regarding vehicle safety and recalls.

## I. Explosion of GM Recalls Further Confirms Lack of Internal Controls

181. GM has seen a massive surge in the number of recalls in 2014, and especially since February 13, 2014, when the Company first publicly announced it

---

[66] *See supra* note 15.

[67] *See supra* note 63.

would recall the 2005-2007 Chevrolet Cobalt and 2007 Pontiac G5 vehicles. The breadth and scale of this sudden, ever-growing avalanche of recalls confirms that the Individual Defendants failed to implement or monitor or oversee a vehicle recall and safety reporting information system to adequately inform senior management and the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations related thereto. It is evident that ever since senior management and the Board have finally begun to implement much needed internal controls and to monitor safety and recall issues, the Company is announcing numerous recalls, many of which involve serious issues that should have been addressed years ago.

182. For each year between 2009 and 2013, GM recalled approximately the following number of vehicles:

| Year | # of Vehicles Recalled |
|------|------------------------|
| 2009 | 2.3 million |
| 2010 | 4 million |
| 2011 | .5 million |
| 2012 | 1.5 million |
| 2013 | .8 million |

183. In stark contrast to the five years prior, GM has so far recalled approximately *twenty-six million* vehicles in *America* alone during the first seven months of 2014. That figure is thirty-four times larger than the number of recalls in 2013, or about a 3,300% increase. The recalls so far in 2014 are more than fourteen times greater than the average number of recalls during the five previous years,

representing an increase of 1,335% over the average.  Moreover, GM has thus far recalled nearly three times more vehicles in 2014 than the nine million cars recalled between 2009 and 2013.

184.  *Globally*, GM has recalled more than ***twenty-nine million*** vehicles so far in 2014.  This represents ***more than three times the total number vehicles sold by GM in the past three years***.  Between 2011 and 2013, GM sold a combined total of twenty-eight million vehicles (or an average of about 9.3 million a year).

185.  Below is a list of recalls in America announced by GM in 2014.  Many involve potentially serious safety matters, including fixing defects with brakes, seat belts, and air bags.  Since the date of the first recall on January 13, 2014, GM has issued sixty-six recalls totaling approximately twenty-six million U.S. vehicles ranging from model years 1997 through 2015.  In total, ***GM has recalled over 16.5 million vehicles world-wide for issues related to faulty ignition switches***.

On **January 13, 2014**, GM issues its first recall of 2014 for 324,970 vehicles due to overheated exhaust components.  Vehicles being recalled include all 2014 Chevrolet Silverado and GMC Sierra full-size pickups.

On **February 13, 2014**, GM issues a recall for 778,000 cars in North America due to issues related to faulty ignition switches.  The ignition switches can unintentionally shift into the off position while driving and can also shut off the electrical components in the car that activate the airbags.  Cars being recalled include both the Chevrolet Cobalt and Pontiac G5.  The Company reports six traffic deaths related to the problem.

On **February 20, 2014**, GM recalls 355 cars related to transmission shift cable adjuster body fractures. Cars being recalled include the 2014 model for the Buick Enclave, LaCrosse, Regal, and Verano; Chevrolet Cruze, Impala, Malibu, Traverse; and GMC Acadia.

On **February 25, 2014**, GM recalls an additional 598,000 vehicles, expanding the ignition recall to 1,376,000 million cars within the U.S. and approximately 1.6 million worldwide. GM raised the number of reported incidents involving frontal crashes, in which the recall condition may have caused or contributed to the non-deployment of the frontal airbags, to thirty-one incidents, with thirteen front-seat fatalities involved. However, consumer advocates report much higher death tolls. Cars being recalled include: Chevrolet Cobalt (2005-2007 models); Pontiac G5 (2005-2007 models); Pontiac Pursuit (2005-2007 models which were sold in Canada only); Saturn Ion (2003-2007 models); Chevrolet HHRs (2006-2007 models); Pontiac Solstice (2006-2007 models); and Saturn Sky (2007 model).

On **March 17, 2014**, GM recalls 69,903 Cadillac XTS 2013 and 2014 models due to the brake vacuum booster pump vent and connector.

On **March 17, 2014**, GM recalls 303,013 cars due to front passenger airbag performance. Cars being recalled include the Chevrolet Express and GMC Savana 2009-2014 models.

On **March 17, 2014,** GM recalls 1,176,407 cars for issues related to the side impact airbag connector. Cars being recalled include the Buick Enclave, Chevrolet Traverse, GMC Acadia, and Saturn Outlook 2008-2013 models.

On **March 28, 2014**, GM recalls 656 of the 2014 Cadillac ELR model due to an issue with the electronic brake control module calibration.

On **March 28, 2014**, GM recalls 824,000 more vehicles in the U.S. related to ignition switch failure, bringing the total to 2.6 million cars worldwide. Cars being recalled were expanded to include all models of the Chevrolet Cobalt, HHR, Pontiac G5, Pontiac Solstice, Saturn Ion, and Saturn Sky. GM also confirmed that one more death had been caused by the ignition switch problem, pushing the total to thirteen.

On **March 28, 2014**, GM recalls 174,046 cars due to a half shaft fracture.  Cars being recalled include 2013 and 2014 MY Chevrolet Cruze models equipped with 1.4L turbocharged engine (RPO LUV).

On **March 28, 2014**, GM recalls 489,936 cars due to oil cooler fitting.  Cars being recalled include 2014-2015 full-size trucks and full-size utilities with MYC transmission.

On **March 31, 2014**, GM recalls 1,340,447 cars due to faulty electronic power steering.  Cars being recalled include Chevrolet Malibu/Malibu Maxx (2004-2005 models), Pontiac G6 (2004-2006 models); Saturn Ion (2004-2007 models); Chevrolet Malibu (2008-2009 models); Pontiac G6 (2008-2009 models); Saturn Aura (2008-2009 models); Chevrolet Cobalt (2010); Chevrolet HHR (2009-2010 models); and previous EPS recall service parts.

On **April 9, 2014**, GM recalls 2,191,014 cars due to a faulty ignition cylinder.  Cars being recalled include the Chevrolet Cobalt (2005-2010 models); Chevrolet HHR (2006-2011 models); Pontiac G5 (2003-2010 models); Pontiac Solstice (2006-2010); Saturn Ion (2003-2007); and Saturn Sky (2007-2010 models).

On **April 19, 2014**, GM recalls 23,249 Pontiac Vibe 2009-2010 models related to Toyota air bags.

On **April 24, 2014**, GM recalls 50,571 of the 2013 Cadillac SRX related to a "hesitation" issue.

On **April 24, 2014**, GM recalls fifty-one cars related to the diesel transfer pump.  Cars being recalled include the 2014 Chevrolet Silverado HD and 2015 GMC Sierra HD.

On **April 29, 2014**, GM recalls 51,640 cars due to an inaccurate fuel gauge.  Cars being recalled include the 2014 Chevrolet Traverse, GMC Acadia, and Buick Enclave.

On **April 29, 2014**, GM recalls 56,214 Saturn Aura 2007-2008 models due to an issue with the shift cable.

On **May 7, 2014**, GM recalls 8,208 cars due to brake rotor issues. Cars being recalled include the 2014 Chevrolet Malibu and Buick LaCrosse.

On **May 13, 2014,** GM recalls 140,067 of the 2014 Chevrolet Malibu due to an issue with brake boost.

On **May 13, 2014,** GM recalls 477 cars due to an issue with tie-rods. Cars being recalled include the 2014 Chevrolet Silverado, 2014 GMC Sierra Light Duty, and 2015 Chevrolet Tahoe.

On **May 14, 2014,** GM recalls 103,158 Chevrolet Corvette 2005-2007 models due to a problem with the low beams.

On **May 14, 2014**, GM recalls 19,225 of the 2014 Cadillac CTS due to wiper issues.

On **May 14, 2014,** GM recalls 2,440,524 cars due to brake lamp issues. Cars being recalled include the Chevrolet Malibu (2004-2012 models) and Malibu Maxx (2004-2007 models); Pontiac G6 (2005-2010 models); and Saturn Aura (2007-2010 models).

On **May 16, 2014,** GM recalls 1,402 of the 2015 Cadillac Escalade for problems related to the passenger airbags.

On **May 19, 2014,** GM recalls 1,074,932 cars due to faulty shift cables. Cars being recalled include the Chevrolet Malibu (2004-2008 models) and Pontiac G6 (2005-2008 models).

On **May 19, 2014,** GM recalls 1,339,355 cars due to front seat belt issues. Cars being recalled include the Saturn Outlook (2009-2010 models), Chevrolet Traverse (2009-2014 models), GMC Acadia (2009-2014 models), and Buick Enclave (2009-2014 models).

On **May 19, 2014,** GM recalls fifty-eight cars due to loose fuse blocks. Cars being recalled include the 2015 Chevrolet Silverado HD and GMC Sierra HD.

On **May 21, 2014**, GM recalls 217,454 U.S. cars due to issues related to daytime running lamps. Cars being recalled include the Chevrolet Aveo (2004-2008 models) and Pontiac Wave (2005-2008 models), and G3 (2005-2008 models).

On **May 21, 2014**, GM recalls 214 cars imported from GM Korea, due to issues related to daytime running lamps. Cars being recalled include the Chevrolet Optra (2004-2008 models).

On **May 30, 2014,** GM recalls 334 cars due to the sensing and diagnostic module. Cars being recalled include the 2014 Chevrolet Silverado and GMC Sierra; the 2015 Chevrolet Tahoe and Suburban, GMC Yukon and Yukon XL, and Cadillac Escalade and Escalade ESV.

On **June 6, 2014,** GM recalls 57,512 cars for an issue related to the base radio. Cars being recalled include the 2014 Chevrolet Silverado and GMC Sierra; and the 2015 Chevrolet Silverado, Tahoe, and Suburban; and GMC Sierra and Yukon.

On **June 6, 2014,** GM recalls 31,520 cars due to the driver airbag. Cars being recalled include the 2012 Buick Verano, Chevrolet Camaro, Cruze, and Sonic compact cars.

On **June 6, 2014,** GM recalls sixty-one cars due to the passenger air bag. Cars being recalled include the 2013-2014 Chevrolet Spark and the 2013 model year Buick Encores manufactured in Changwon, Korea.

On **June 6, 2014,** GM recalls thirty-three of the 2014 Chevrolet Corvette due to a sensing and diagnostic module issue.

On **June 11, 2014,** GM recalls 28,789 of the Saab 9-3 convertible 2004-2011 models due to an issue related to the driver seat belt.

On **June 11, 2014,** GM recalls 21,567 cars due to an issue with the transmission turbine. Cars being recalled include the Chevrolet Sonic 2012 model-year compacts with six-speed automatic transmission and a 1.8-liter four-cylinder engine.

On **June 11, 2014,** GM recalls 14,765 of the 2014 Buick LaCrosse sedan due to an issue with the driver door wiring.

On **June 13, 2014,** GM recalls 464,712 Chevrolet Camaros models 2010-2014 models for both an issue with the key fob and ignition switch.

On **June 16, 2014**, GM announces that it is recalling about 3.4 million 2000-2014 model-year cars to replace ignition keys because the switch may move out of the "run" position if the key is carrying extra weight and experience some jarring event. Cars being recalled include the Buick Lacrosse (2005-2009 models), Chevrolet Impala (2006-2014 models), Cadillac Deville (2000-2005 models), Cadillac DTS (2004-2011 models), Buick Lucerne (2006-2011 models), Buick Regal LS & GS (2004-2005 models), and Chevrolet Monte Carlo (2006-2008 models).

On **June 16, 2014,** GM recalls 90,750 cars due to an issue with the shift cable. Cars being recalled include the 2013 Cadillac ATS and 2014 Cadillac CTS.

On **June 16, 2014,** GM recalls 57,192 cars for a steering pump clam inspection. Cars being recalled include the 2015 Chevrolet Silverado 2500/3500 HD and GMC Sierra 2500/3500 HD.

On **June 16, 2014,** GM recalls 16,932 of the 2011 Cadillac AWD CTS due to an issue with the roof rail airbags.

On **June 16, 2014,** GM recalls 712 of the 2013 Chevrolet Corvette with "competition sport seats" due to incorrect airbags that were installed.

On **June 16, 2014,** GM recalls 184 cars for unsecured floor mats. Cars being recalled include the 2014-2015 Chevrolet Silverado and GMC Sierra models.

On **June 27, 2014,** GM recalls 392,459 cars for issues with the 4WD transfer case. Cars being recalled include the 2014-2015 Chevrolet Silverado and GMC Sierra, the 2015 Chevrolet Suburban and Tahoe, and GMC Yukon and Yukon XL with 4WD.

On **June 27, 2014,** GM recalls 29,019 Chevrolet Cruze 2013-2014 models due to issues with the driver airbag.

On **June 27, 2014,** GM recalls 4,794 cars for issues related to the windshield wiper module. Cars being recalled include the Chevrolet Caprice Police (2013-2014 models) and the 2014 Chevrolet SS.

On **June 27, 2014**, GM recalls 1,939 of the 2014 Chevrolet Corvette with the FE1 or FE3 suspension for issues related to the rear shock weld.

On **June 30, 2014,** GM recalls 7,360,007 cars related to unintended ignition key rotation. "The faulty ignition switches can inadvertently cause keys to turn out of the 'run' position, thereby shutting off the engine and cutting power to air bags." Cars being recalled include the Chevrolet Malibu (1997-2005 models); Oldsmobile Intrigue (1998-2002 models); Oldsmobile Alero (1999-2004 models); Pontiac Grand Am (1999-2005 models); Chevrolet Impala (2000-2005 models); Monte Carlo (2000-2005 models); Pontiac Grand Prix (2004-2008 models); Cadillac CTS (2003-2014 models); and Cadillac SRX (2004-2006 models).

On **June 30, 2014**, GM recalls 2,990 cars for issues related to the engine block heater power cord. Cars recalled include the Chevrolet Cruze (2011-2014 models), Sonic (2012-2014 models), and Trax (2013-2014 models) and Buick Encore and Verano.

On **June 30, 2014,** GM recalls 106 cars for the "superhold" joint fastener torque. Cars being recalled include the 2014 Chevrolet Camaro and Impala, Buick Regal, and Cadillac XTS.

On **June 30, 2014,** GM recalls 9,371 cars for issues related to the auxiliary battery underhood fusible link. Cars being recalled include the 2007-2011 Chevrolet Silverado HD and GMC Sierra HD.

On **June 30, 2014,** GM recalls 181,984 cars for issues related to the driver's door module for power locks and window switches that can catch fire. Cars being recalled include the 2005-2007 Buick Rainier, Chevrolet TrailBlazer, GMC Envoy, Isuzu Ascender, Saab 9-7x; and the 2006 Chevrolet TrailBlazer EXT and GMC Envoy XL.

On **July 18, 2014,** GM recalls 1,919 cars for issues related to the lower control arm ball joint. Cars being recalled include the 2014-2015 Chevrolet Spark.

On **July 21, 2014,** GM recalls 120,426 cars for issues related to the front turn signal bulbs. Cars being recalled include the 2013 Chevrolet Malibu and the Buick Regal (2011-2013 models).

On **July 22, 2014,** GM recalls twenty-two vehicles due to issues with the roof rail airbag. Vehicles being recalled include the 2015 Chevrolet Tahoe and Suburban and GMC Yukon and Yukon XL.

On **July 22, 2014,** GM recalls 57,242 of the 2014 Chevrolet Impala due to issues with the electronic power steering.

On **July 22, 2014,** GM recalls 414,333 cars for issues related to the power height adjustable seats. Cars being recalled include 2010-2012 Chevrolet Equinox, GMC Terrain, and Cadillac SRX, as well as, 2011-2012 Chevrolet Camaro and Buick Regal and LaCrosse.

On **July 22, 2014,** GM recalls 124,007 cars for issues related to the "seat hook weld incomplete." Cars being recalled include the 2013-2014 Buick Encore and Cadillac ATS; 2014 Cadillac CTS and ELR; Chevrolet SS, Caprice, Caprice PPV, and Silverado 1500; and GMC Sierra 1500; and the 2014 Chevrolet Silverado 2500/3500 HD and GMC Sierra 2500/3500 HD.

On **July 28, 2014,** GM recalls 1,968 cars due to reduced brake performance. Cars being recalled include the 2007 Chevrolet Optra (Canada), 2009-2010 Chevrolet Aveo, and 2009 Pontiac G3/Wave.

On **July 31, 2014,** GM recalls 1,919 of the 2014 Chevrolet Spark due to issues with the "lower control arms attaching bolts."

On **August 7, 2014,** GM recalls 48,059 cars due to issues with the frontal lapbelt pretensioners. Cars being recalled include the 2013 Cadillac ATS, Chevrolet Trax (Canada), and Buick Encore (imported models).

| |
|---|
| On **August 7, 2014,** GM recalls 202,155 of the 2002-2004 Saturn Vue due to the ignition key pullout in run position. |
| On **August 7, 2014,** GM recalls 2013-2014 of the Cadillac ATS (export models only) due to issues related to the front exterior lighting (NC). There were zero recalls within the United States and 3,624 cars recalled internationally. |
| On **August 7, 2014,** GM recalls 14,940 of the 2014-2015 Chevrolet Impala due to issues with the console bin door latch (NC). |

186. The history of some of the above recalls reflect the terrible fiduciary failure of the Individual Defendants to monitor and oversee safety and recalls. For example, on March 17, 2014, GM issued a long overdue recall for nearly 1.2 million vehicles sold between 2007 until at least 2013 to address defects in their airbag system.[68] The issue appears rooted in a cost-cutting decision to use gold-plated terminals to connect wiring harnesses to cheaper tin terminals beginning 2007. In June 2008, personnel at GM noticed increased warranty claims for airbag service on certain of GM vehicles. After analysis of the tin connectors in September 2008, the determination was made that corrosion and wear to the connectors was causing the increased resistance in the airbag wiring. Rather than issue a recall, GM released a technical service bulletin offering a cheap fix to dealers. Specifically, dealers were instructed to repair the defect by using Nyogel grease,

---

[68] *See* GM Notification Campaign No. 14V-118, at 3 (March 31, 2014).

securing the connectors, and adding slack to the line. Meanwhile, GM quietly began the transition back to gold-plated terminals in some if its vehicles, suspended all investigation into the defective airbag wiring, and took no further action.[69]

187.   In November 2009, after the new GM emerged from the bankruptcy, persons at the Company learned of similar reports of increased airbag service messages in newer 2010 vehicles. After investigation, individuals at GM concluded that corrosion and wear in the same tin connector was causing the airbag problems. In January 2010, a conclusion was reached by people at GM that the wiring issue could ultimately lead to a failure of an airbag to deploy in a side impact collision.[70] But rather than issue a recall, on May 11, 2010, GM issued a Customer Satisfaction Bulletin for the 2010 model vehicles and gave certain instructions to dealers to secure the wire harnesses, and if necessary, reroute them.[71]  After seeing a spike in airbag service warranty claims and concluding that the November 2008 bulletin was "not entirely effective" in correcting the wiring defect, GM again failed to call a recall, but issued on November 23, 2010 another Customer Service Bulletin for certain cars built around 2007-2008, and similarly instructed dealers to secure the

---

[69] *Id*., Attachment B, at 1-2.

[70] *Id*. at 2.

[71] *Id*.

harnesses and re-route or replace the connectors.[72]  On February 3, 2011, GM issued a revised Customer Service Bulletin requiring replacement of connectors in the defective vehicles mentioned in the November 2010 bulletin.[73]

188.  In July 2011, GM again replaced its connector, this time with one bearing a silver-sealed terminal for 2012 model year vehicles.[74]  Warranty claims spiked for these vehicles built in the second half of 2011, and people at GM identified inadequate crimping of the connector terminal.  Rather than a recall, GM issued an internal bulletin on November 8, 2012, recommending that dealers replace the original connector with a newly sealed connector.[75]  But this too did not cure the defect.

189.  In 2013, GM again saw a surge in maintenance and warranty activity arising from airbag troubles.  GM opened yet another investigation.[76]  But only after a call from the NHTSA on March 14, 2014, did GM finally issue an actual safety

---

[72] *Id.* at 3.

[73] *Id.*

[74] *Id.*

[75] *Id.* at 4.

[76] *Id.*

2:14-cv-11277-RHC-MKM    Doc # 81    Filed 08/10/17    Pg 121 of 144    Pg ID 1440

recall for vehicles with the faulty harness wiring. The number of recalled vehicles was expanded a couple days later to cover a total of almost 1.2 million vehicles.[77]

190.   Another recent example of belated, yet urgent, recalls is GM's June 30, 2014 recall of over 180,000 sport utility vehicles ("SUVs") for issues related to the driver's door module for power locks and window switches that can catch fire.[78]  As the *Associated Press* reported on August 8, 2014, in an article titled "GM Issues Third Recall for SUVs that Can Catch Fire," the switch problem "is so serious that GM is telling customers to park the SUVs outdoors until they are repaired because they could catch fire when left unattended."[79]  This safety issue first appeared at least as early as February 9, 2012, when the NHTSA began investigating consumer complaints of fires in the switches on the driver's sidedoor that control power windows.[80]  Rather than issue a recall, GM initially launched a "service campaign" involving letters to owners telling them that water could get to the switches and cause their circuits to rust, which could in turn cause shorting, overheating, and

---

[77] *Id*. at 5.

[78] *See* GM Notification Campaign No. 14V-404, at 3 (July 2, 2014).

[79]  Tom Krisher, *GM Issues Third Recall for SUVs That Can Catch Fire*, Associated Press, (Aug. 8, 2014), http://bigstory.ap.org/article/gm-issues-third-recall-suvs-can-catch-fire.

[80] *See* GM Notification Campaign No. 12V-406, at 1 (Aug. 15, 2012).

- 120 -

possibly fires.[81]   As of December 2012, and only after the government pressured
GM, the Company had recalled 2,780,000 SUVs in cold-weather states only.[82]   But
NHTSA kept investigating, and GM expanded the recall to be nationwide around
June 2013.[83]   NHTSA and GM, by that point, had received 242 complaints –
twenty-eight of which involved fires.   One such complaint dated back to October
2008, describing how a 2006 TrailBlazer burst into flames while parked on a
driveway.[84]   The initial recalls, however, provided a cheap, inadequate fix of the
problem.   Reflecting the cost-oriented culture tolerated (if not supported) by the
Individual Defendants, GM opted to merely put a protective coating around the
window switch circuit boards, which costs less than replacing the switches.  As one
could expect, the switches continued to malfunction even in cars that had been
"repaired." GM was forced to call a third recall in June 2014 to do what it should
have done from the outset: replace all the switches.

191.  In delaying, until recently, the numerous recalls, GM distorted for
years the real costs of operations from shareholders and the public, making the

_____

[81] *See* GM Representative Letter RCONL-12V406-3467 (undated).

[82] *See* GM Notification Campaign No. 12V-406 Update, at 2 (Dec. 5, 2012).

[83] *See* NHTSA Campaign No. 13V-248 acknowledgement letter, at 2 (June 14,
2013).

[84] *See supra* note 78.

Company's financial outlook appear better than it really was. For just the first half of 2014, GM has reported over $2.5 billion in recall-related cost. The first quarter of 2014 was the first time GM specifically reported recall-related costs, so figures for prior years are not publicly available for comparison. Nonetheless, upon information and belief, plaintiffs allege that $2.5 billion in two quarters marks a substantial increase over prior periods, and represents a significant shifting of costs to fiscal year 2014 that should have been incurred in prior periods.

192. The sudden explosion in recalls demonstrates the sustained and systematic failure of the Individual Defendants to exercise their fiduciary duties to the Company by – until recently – utterly failing to implement internal controls to keep them informed of critical vehicle safety and recall issues and to ensure compliance with related laws and regulations. Had the Individual Defendants been fulfilling their oversight and monitoring duties, most of the above recalls would have occurred earlier rather than belatedly in 2014.

193. Only now that the Individual Defendants have begun to implement much needed internal controls and to monitor safety and recall issues does it seem that the Company is committed to safety. Or, as defendant Barra proclaimed on April 1, 2014, it now appears GM has "moved from a cost culture to a customer culture." But this transition comes years too late for the drivers and passengers of GM vehicles who have lost their lives or been injured due to GM's failure to initiate

recalls, and for GM's shareholders who have suffered and will continue to suffer substantial wealth destruction due to the Individual Defendants' breaches of their fiduciary duties.

## VII.  DAMAGES TO GM

194.  As a result of the Individual Defendants' improprieties, GM failed to timely issue a recall for a deadly defect that was identified over a decade ago, thus resulting in multiple personal injury and class action lawsuits against the Company.[85]  Moreover, these actions have exposed the Company to billions of dollars in liability.

195.  GM's performance issues also damaged the Company's reputation with its customers, within the business community, and in the capital markets. According to a recent *Consumer Reports* study, the most important factor for car buyers when considering which make and model of car to purchase is safety. Consumers are less likely to purchase vehicles from a company that fails to disclose known and deadly safety issues.  Similarly, in a paper titled "The Attributes of a Costly Recall: Evidence from the Automotive Industry," Nicholas G. Rupp of the Department of Economics at East Carolina University found that "the indirect costs

---

[85] In April 2014, six U.S. Senators requested that the DOJ intervene in these pending civil actions to oppose any action by GM to deny responsibility for consumer damages on the basis that those damages may have resulted from deceptive and fraudulent concealment by the Company.

of automotive recalls are likely larger than the direct costs."  "Specifically," Mr. Rupp adds, "we detect *significant goodwill losses* for the initial recall of a make, model, and year and for companies with AAA bond-ratings."   In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the False Statement Defendants have materially increased the perceived risks of investing in and lending money to the Company.

196.   Further, as a direct and proximate result of the Individual Defendants' actions, GM has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    the $35 million civil penalty for GM's violation of the Safety Act;

(b)    costs incurred from defending and paying any settlement in the personal injury and class action lawsuits for injuries and other damages suffered by the Company's customers;

(c)    costs incurred from defending and paying any settlement in the class action for violations of federal securities laws;

(d)    costs incurred from responding to various governmental investigations;

(e)     costs incurred from other fines and/or penalties resulting from the Company's delay in disclosing known defects; and

(f)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to GM.

## VIII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

197.   Plaintiffs bring this action derivatively in the right and for the benefit of GM to redress injuries suffered, and to be suffered, by GM as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  GM is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

198.   Plaintiffs will adequately and fairly represent the interests of GM in enforcing and prosecuting its rights.

199.  Plaintiffs were shareholders of GM at the time of the continuous wrongdoing complained of, have continuously been shareholders since that time, and are current GM shareholders.

200.   The Board of GM at the time the initial complaint was filed consisted of the following fourteen individuals: defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson.  The Board of GM at the time plaintiffs filed their initial consolidated

complaint consisted of defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Mulva, Mullen, Isdell, and Stephenson.  The Board of GM at the time this amended consolidated complaint is filed consists of defendants Barra, Mullen, Mulva, Russo, Schoewe, Solso, and Stephenson, as well as non-defendants Joseph J. Ashton, Linda R. Gooden, Joseph Jimenez, and Jane L. Mendillo.  In other words, through and including the filing of this complaint, some of the Director Defendants continue to comprise at least a majority of GM's Board.

201.  Plaintiffs have not made any demand on GM's Board to institute this action.  They are excused from doing so because such a demand would be a futile, wasteful, and useless act, as set forth below.

**A.    Demand Is Excused Because Defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson's Conduct Is Not a Valid Exercise of Business Judgment**

202.  Defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson (the members of the Board at the time the initial complaint was filed) approved and signed one or more misleading Forms 10-K.  These SEC filings improperly touted the Company's commitment to safety and misled the investing public regarding the Company's exposure to litigation and the resulting effects on GM's operations and performance.  The filings also misstated GM's business and financial condition by, among other things, understating expenses, overstating income, and understating liabilities.  As

detailed herein, given the Individual Defendants' failure to implement a vehicle recall and safety reporting information system, these defendants had absolutely no basis for making their improper statements. In touting the Company's commitment to safety and reporting the Company's financial condition, defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson, either acted in bad faith or failed to properly inform themselves of all material information that was reasonably available to them. Such material information included the fact that: (i) the Company did not have a vehicle recall and safety reporting information system to adequately inform senior management or the Board of material vehicle safety and recall issues, including with regard to fatalities, and to ensure the Company's compliance with laws and regulations related thereto; and (ii) the Company needed to recall vast numbers of cars for serious or potentially serious safety defects, including the 2005-2007 Chevrolet Cobalt and 2007 Pontiac G5 vehicles. Thus, defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson's approval and signing of one or more misleading Forms 10-K were not valid exercises of business judgment. Accordingly, demand on the Board is excused.

      **B.**    **Demand Is Excused Because Defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson Face a Substantial Likelihood of Liability for Their Misconduct**

203.   As alleged above and re-summarized below, defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson   (the members of the Board at the time the initial complaint was filed), despite their fundamental duty to do so, utterly failed to implement, monitor, or oversee a vehicle recall and safety reporting information system to adequately inform the Board of critical vehicle safety and recall issues and to ensure the Company's compliance with laws and regulations, all while touting the Company's commitment to safety.   In other words, the Individual Defendants failed to act in the face of a known duty to act, constituting a conscious disregard for their responsibilities and a breach of their duty of loyalty.  These defendants therefore face a substantial likelihood of personal liability, rendering them unable to impartially consider a pre-suit demand by plaintiffs.  Accordingly, plaintiffs are excused from making a demand on these individuals, who were the members of the Board at the time the initial complaint was filed.

204.   Defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson, as members of the Board, have a principle duty to ensure that the Company operates in compliance with all applicable laws and regulations, especially when the safety of its customers is at issue.  The Safety Act, for example, requires that manufacturers: (i) notify owners of vehicles and provide a remedy for any vehicle defect that creates an

unreasonable risk to motor vehicle safety or noncompliance with a safety standard; and (ii) promptly report safety defects to the NHTSA within five days of discovering them. Acknowledging these responsibilities, defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson each approved and signed one or more Forms 10-K assuring the public that potential defects would be reported and the vehicles in question would be recalled if necessary. Reinforcing the duty of these defendants to be informed about safety and recall matters, the Forms 10-K they approved and signed also touted that GM is "committed to leadership in vehicle design, quality, reliability, telematics and infotainment and *safety*," and touted that the Company was poised to compete in the global automotive marketplace due to the purported safety and reliability of GM's vehicles.

205.   At a minimum, the fiduciary duties of defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson required them to implement and maintain internal controls to ensure the Board and senior management received reports of vehicle safety defects linked to customer deaths, especially where (as here) vehicles plagued with these defects were still on the road. But these defendants failed to implement adequate internal controls to ensure that regulators and customers were timely and adequately notified of vehicle defects creating an unreasonable risk to motor vehicle safety or a

noncompliance with safety standards.  In fact, the NHTSA fined GM $35 million for violating the Safety Act – the *maximum* available civil penalty.  The size of this fine alone confirms that the Safety Act violations caused by the above defendants were of substantial magnitude and duration.

206.  For years defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson and the other Individual Defendants failed to implement a vehicle recall and safety reporting information system, leaving them and senior management hopelessly in the dark as GM personnel (including the legal department) sat on a flood of critical information demonstrating that numerous vehicles in the Company's line-up were plagued with faulty ignition switches that could and did cause vehicles to lose power while driving and render the airbags non-operational.  Instead of fulfilling their fiduciary duties, these defendants permitted processes and a culture that was directly counter to their oversight and monitoring responsibilities.  As discussed above, having abdicated their duties to monitor and oversee safety and recall matters, defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson paved the way for GM to develop or otherwise maintain internal processes and a corporate culture that: (i) intentionally excluded senior management and the Board from the recall process; (ii) failed to require accountability; (iii) instead discouraged frank communications

about safety issues; and (iv) allowed GM personnel – and not just senior management and the Board – to remain compartmentalized and in the dark regarding important safety matters. Indeed, there was no reporting system even in the legal department to ensure that material information regarding fatalities and the nature of defects was elevated to senior management and the Board.

207. As detailed above, the sustained and systematic failure to implement a vehicle recall and safety reporting information system has been confirmed by numerous sources, including the findings of the Valukas Report and statements made by defendants and others at the Company. For example, during a Senate hearing, defendant Millikin, as GM's General Counsel, admitted that he did not know of the ignition-switch defect until February 2014, nor was he aware of litigation involving fatal accidents linked to the defect. Defendant Barra, despite her various senior roles at the Company during relevant times, has claimed similar ignorance. The utter, systematic breakdown of internal controls is further confirmed by: (i) the overdue safety initiatives recently adopted at the Company, including new safety controls and governance changes; and (ii) the sudden explosion of recalls announced by GM so far in 2014.

208. Defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson (the members of the Board at the time the initial complaint was filed) also each breached their duty

of loyalty by causing or allowing the Company to disseminate inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition. Each of these defendants signed one or more misleading Forms 10-K and caused or allowed the Company to issue multiple misleading Forms 10-Q. These SEC filings improperly touted the Company's commitment to safety and misled the investing public regarding the Company's exposure to litigation and the resulting effects on GM's operations and performance. As detailed herein, given the Individual Defendants' failure to implement a vehicle recall and safety reporting information system, these defendants had absolutely no basis for making these statements.

209.   Any suit by the current directors of GM to remedy these wrongs would expose defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson (the current members of the Board at the time the initial complaint was filed) and GM to liability for multiple pending personal injury and class action lawsuits, and would result in civil actions being filed against one or more of the other Individual Defendants. If the Board elects for the Company to press forward with its right of action against defendants Barra, Solso, Girsky, Russo, Schoewe, Davis, Marinello, Krebs, Telles, Mulva, Mullen, Bonderman, Isdell, and Stephenson in this action, then GM's efforts

would compromise its defense of the above-noted actions. Accordingly, demand on the Board is excused.

210. Moreover, the acts complained of constitute violations of the fiduciary duties owed by GM's officers and directors and these acts are incapable of ratification.

211. GM has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for GM any part of the damages GM suffered and will suffer thereby.

212. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiffs, the current Board has failed and refused to seek to recover for GM for any of the wrongdoing alleged by plaintiffs herein.

213. Plaintiffs have not made any demand on the other shareholders of GM to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)  GM is a publicly held company with over 1.4 billion shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

## IX.    COUNT I — AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

214.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

215.    The Individual Defendants owed and owe GM fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe GM the highest obligation of good faith, fair dealing, loyalty, and due care.

216.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith to the extent they were directors of the Company, and also their duty of care to the extent they were officers of the Company, by failing to implement internal controls to ensure the Board, management, and/or themselves received reports of vehicle recalls and safety defects linked to customer deaths, by creating a culture of lawlessness within GM, and/or consciously or with gross negligence failing to prevent the Company from engaging in the unlawful acts complained of herein.

217.   The Officer Defendants, in their capacities as officers of the Company, breached their fiduciary duty of care and loyalty by knowingly, recklessly, or in gross negligence, failing to inform themselves of, and structuring processes and procedures that would keep them ignorant of, material information concerning the Company's operations, including regarding recalls and the safety of GM's vehicles.

218.   Defendants Akerson, Ammann, Barra, Cyprus, Stevens, Timko, and Whitacre, in their capacities as officers of the Company, also breached their fiduciary duty of care and loyalty by knowingly, recklessly, or in gross negligence, disseminating inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition.

219.   The Director Defendants, as directors serving on GM's Board, violated their duty of loyalty by: (i) utterly failing to implement and maintain a vehicle recall and safety reporting information system; and (ii) nonetheless, knowingly or in conscious disregard disseminating inaccurate information with regard to the Company's safety record and commitment to safety, as well as with respect to GM's business and financial condition, without a basis for making such statements.   In other words, as to their failure to implement and maintain the necessary information system, the Director Defendants failed to act in the face of a known duty to act,

- 135 -

2:14-cv-11277-RHC-MKM    Doc # 81    Filed 08/10/17    Pg 137 of 144    Pg ID 1456

constituting a conscious disregard for their responsibilities and a breach of their duty of loyalty.

220.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GM has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

221.   Plaintiffs, on behalf of GM, have no adequate remedy at law.

## X.   COUNT II — AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

222.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

223.   As a result of the wrongdoing detailed herein, the Individual Defendants have caused GM to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

224.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

225.   Plaintiffs, on behalf of GM, have no adequate remedy at law.

## XI.   COUNT III — AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

226.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

- 136 -

227.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of GM.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to GM.

228.   Plaintiffs, as shareholders and representatives of GM, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

229.   Plaintiffs, on behalf of GM, have no adequate remedy at law.

## XII.   PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of GM, demand judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing GM to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GM, its customers, and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or

Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.    a proposal to create a Board committee with oversight over safety, inspection, and maintenance matters;

2.    a proposal to appropriately test and then strengthen the Company's internal controls over safety, inspection, maintenance, and recall matters;

3.    a proposal to strengthen the Board's supervision of inspection, maintenance, and recall operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.    a proposal to strengthen GM's oversight of its disclosure procedures;

5.    a proposal to ensure the accuracy of the qualifications of GM's directors, executives, and other employees;

6.    a provision to permit the shareholders of GM to nominate at least four candidates for election to the Board; and

7.    a provision to maintain separation of CEO and Chairman of the Board so that no person may serve in both capacities at the same time;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching,

impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of GM have an effective remedy;

D.     Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## XIII. JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: August 10, 2017

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
KEVIN A. SEELY

/s/ *Kevin A. Seely*
KEVIN A. SEELY

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com

*Lead Counsel for Plaintiffs*

JAY RAZZOUK, ATTORNEY AT LAW
JAY N. RAZZOUK
473 E. Carnegie Drive, Suite 200
San Bernardino, CA 92408
Telephone: (909) 547-7299
Facsimile: (855) 264-4224
jay@razzlaw.com

*Counsel for Plaintiffs*

MANTESE HONIGMAN, P.C.
David M. Honigman (P33146)
Gerard V. Mantese (P34424)
1361 E. Big Beaver Road
Troy, MI 48083
Telephone: (248) 457-9200
Facsimile: (248) 457-9201
dhonigman@manteselaw.com
gmantese@manteselaw.com

*Liaison Counsel for Plaintiffs*

1147972

- 140 -

VERIFICATION

I, Stephen G. Olish, hereby declare as follows:

I am the Executive Director of The Police Retirement System of St. Louis (the "Fund"). The Fund is a plaintiff in a shareholder derivative action brought on behalf of General Motors Company ("GM") and consolidated under lead case number 2:14-cv-11277-RHC-MKM.

The Fund is a current shareholder of GM and has continuously held without interruption GM common stock since on or around November 23, 2010.

I have read the Verified Amended Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "Amended Consolidated Complaint"), a substantially similar version of which I understand is to be filed no later than August 11, 2017. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Amended Consolidated Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _August 10, 2017_

_Stephen G. Olish_
STEPHEN G. OLISH

## VERIFICATION

I, Richard Hockstein, hereby declare as follows:

I am a plaintiff in a shareholder derivative action brought on behalf of General Motors Company ("GM") and consolidated under lead case number 2:14-cv-11277-RHC-MKM.

I am a current shareholder of GM and have continuously held without interruption GM common stock since on or around April 25, 2011.

I have read the Verified Amended Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "Amended Consolidated Complaint"), a substantially similar version of which I understand is to be filed no later than August 11, 2017. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Amended Consolidated Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:


Dated: _8/8/17_____


_____
RICHARD HOCKSTEIN

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2017, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send electronic notice of same to all counsel of record.

/s/ *Kevin A. Seely*
Kevin A. Seely
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile: (619) 525-3991
kseely@robbinsarroyo.com
